## JUNE FOX, Plaintiff in Error, v. STATE OF TENNESSEE, Defendant in Error.

Court of Criminal Appeals of Tennessee. Dec. 17, 1968.

Certiorari Denied by Supreme Court June 2, 1969.

310

J. D. Lee, Madisonville, William B. Felknor, Maryville, for plaintiff in error.

George F. McCanless, Atty. Gen. of Tenn., Lance D. Evans, Asst. Atty. Gen., Nashville, James P. Watkins, Dist. Atty. Gen., Loudon, for defendant in error.

## OPINION

OLIVER, Judge.

Mrs. June Fox, the plaintiff in error and defendant below, after a change of venue at her instance from Loudon County to Blount County, was convicted in the Criminal Court of Blount County upon two separate indictments, apparently tried together by agreement.

In one case, under an indictment charging the defendant with feloniously assaulting Richard Alexander with a loaded gun with intent to commit first degree murder, the jury found her guilty of simple assault and battery, and the court sentenced her to pay a fine of $50 and to imprisonment in the County Workhouse for eleven months and twenty-nine days.

In the other case, in which the indictment charged the defendant with first degree murder in the killing of Ernest Edward Julian, the jury found her guilty of second degree murder, and she was sentenced to imprisonment for ten years in the State Penitentiary.

Her motions for a new trial in each case being overruled, the defendant prayed and was granted and has perfected an appeal in the nature of a writ of error to this Court in each case.

The shooting occurred at the home of the defendant and her husband in Loudon, Tennessee, sometime between 8:30 p.m. and 9:00 p.m. on February 3, 1967. They had lived in that house about one year, but had lived in the immediate neighborhood for twenty-six years, an area thickly populated and containing numerous business establishments. She had been disturbed repeatedly by burglars and prowlers around their home at night. She was forty-nine years old, was not in good health and was in a very nervous condition; ten years earlier she had an appendectomy, five years later a cancer was removed from her arm, and two years before this tragic occurrence she had undergone a hysterectomy and had been highly nervous since that time. She and her husband lived alone. He was employed at night at a nearby gasoline service station, only two houses and a vacant lot from their home, about 225 feet. She was at home alone.

Ernest Edward Julian who was ten years old, and Richard Alexander who was thirteen, went into the defendant's yard endeavoring to recapture an opossum that had escaped from them. The defendant's dog was in a lot near the rear of her house. Alarmed when the dog began

barking and hearing a noise outside, she looked through a rear bedroom window and saw someone, picked up a pistol that was on the dresser, went out on the front porch without her glasses (without which, according to her, she was almost blind), did not turn on the porch light, and walked to the end of the porch. At this time Richard Alexander was walking from the rear of the defendant's yard toward the front of her house, these two boys having decided to seek her permission to pursue the opossum further into her yard; when the defendant saw Richard approaching she began shooting downwardly in his direction when he was about three feet from the porch and continued firing in a generally wild and indiscriminate manner. One of the first shots struck Richard Alexander in the left leg about six inches below the knee, which felled him, but, the bone not being fractured, he got up and ran across the yard to the street; another one of the defendant's bullets struck Ernest Edward Julian in the head mortally wounding him, and he fell in her yard near the side of and about half way between the front and rear of the defendant's house. She was not acquainted with either of the boys. She testified that she did not intend to kill anyone, that she was scared and afraid and only shot to scare what she thought were burglars, and that she yelled "go away." Richard Alexander asserted that she said nothing before opening fire. After the shooting she went back in the house and called her husband and the police.

The first officer on the scene was Policeman Whitney Williams, who was patrolling in the vicinity and received a call on his car radio. The defendant was on the front porch, her husband in the yard, and she volun-

teered the statements that she did the shooting, that she thought they were burglars, and that she "didn't miss them that time," and "I didn't miss him this time. I hit him right in the head." Another witness, John L. Brown, said he heard the defendant say she shot the boys because they were making a race track through her yard. Brown's wife said she heard the defendant say she shot the boys and that they had no business being in her yard.

In her first, sixth and thirteenth Assignments of Error, the defendant contends that the court committed reversible error in sustaining objections to some of her testimony and by excluding the testimony of the Clerk of the General Sessions Court of Loudon County and parts of the testimony of her husband and the Chief of Police. All of the excluded testimony pertained to an incident some four months earlier involving alleged prowling around the defendant's home by one Hobart Nix, and his subsequent prosecution in the General Sessions Court of Loudon County on a "Peeping Tom" charge in which the defendant testified, and his alleged threat thereafter to return and "get her." All of this was offered to show that the defendant was afraid of Nix, and was scared when she heard her dog barking and noise outside of her home the night in question and that her state of mind at that time negated any contention that she then entertained or was actuated by malice, an essential element of second degree murder.

The defendant testified at length regarding her state of mind at the time of the shooting, her fears and apprehensions based upon her previous experiences with night-time prowlers, her failing health and her extreme nervousness. She testified that she was scared and afraid

of Nix. The defendant was singularly qualified to describe the state of her mind at the time of the shooting, and she was allowed sufficiently ample latitude in doing so.

■■ The details of the Nix incident and his subsequent prosecution were immaterial. Moreover, her past experiences with prowlers and the condition of her health and her nervousness and fright constituted no excuse for her actions.

■ The defendant cites and relies upon Smith v. State, 212 Tenn. 510, 370 S.W.2d 543, in which our Supreme Court held that the evidence was not sufficient to show that the defendant acted with malice aforethought in killing the deceased, and that the evidence did not, therefore, sustain the verdict of second degree murder. The case before us here is clearly distinguishable factually from *Smith*. There the defendant was a night watchman on duty and was suddenly confronted with a person coming toward him in the dark with a flashlight, in a building where burglaries had been committed previously. Here the defendant's only excuse for shooting was that she wanted to scare away the supposed prowlers, which was wholly unnecessary inasmuch as she was in the safety of her own home and could have called the police and/or her husband who was only a very short distance away, instead of taking her pistol and going out onto her porch in the nighttime, without turning on the outside light and without her glasses (which she said severely impaired her vision and rendered her practically blind) and starting shooting in the direction of these boys when she saw one of them approaching. She testified that on previous occasions when she had been

disturbed by prowlers she had called the police and the sheriff, with all of whom she was well acquainted and whose offices were only about a mile away, and that they had responded promptly within a matter of minutes.

The facts of this case are also wholly dissimilar to those in Cooper v. State, 210 Tenn. 63, 356 S.W.2d 405, which the defendant also cites. In that case the defendant shot the deceased after the latter struck him in the mouth inflicting considerable injury during a sudden altercation, and claimed that he fired in self defense.

The statute (T.C.A. § 39-2401) defines murder as follows: "If any person of sound memory and discretion, unlawfully kill any reasonable creature in being, and under the peace of the state, with malice aforethought, either express or implied, such person shall be guilty of murder."

■■ From this definition, it is clear that *malice* is an essential ingredient of murder. A case of homicide cannot be murder unless at and before the killing the wicked intent, constituting malice aforethought, exists in the mind of the slayer. Malice is an intent to do an injury to another, a design formed in the mind of doing mischief to another.

■ *Express malice* is actual malice against the party slain; it exists where a person actually contemplates the injury or wrong which he inflicts. It is shown where the assailant kills his victim for the purpose of wreaking his vengeance, or to gratify feelings of animosity, hatred, or ill will, and where one, with a sedate and deliberate mind and formed design attempts to kill another, which formed design is evidenced either by words or by external

circumstances indicating the inward intentions—such as laying in wait, antecedent menaces, former grudges, and concerted schemes to do the victim some bodily harm.

◼ *Implied malice* is malice not against the party slain, but malice in general, or that condition of mind which indicates a wicked, depraved and malignant spirit, and a heart regardless of social duty and fatally bent on mischief. Malice is implied when it is inferred from the naked fact of the attempted killing, and the act is committed deliberately and is likely to be attended with dangerous consequences. In such case the malice requisite to constitute the offense will be presumed, for the law implies that the natural or probable effect of an act deliberately done is intended by its actor.

In Shorter v. State, 147 Tenn. 355, 247 S.W. 985, our Supreme Court discussed the whole subject of malice in homicide:

"In Ann v. State, 11 Humph. (30 Tenn.), 159, the law is thus laid down: 'To constitute the crime of murder by the common law, and by that law this case is to be governed, the killing must be with malice aforethought; no matter by which of the thousand means adequate to the destruction of life the death may have been effected. Malice, in its legal sense, is the sole criterion by which murder is distinguished from every other species of homicide. The malice essential to constitute the crime of murder, however, is not confined to an intention to take away the life of the deceased, but includes an intent to do any unlawful act which may probably result in depriving the party of life. It is not, in the language of Blackstone, so properly spite or malevolence to the individual in

particular, as an evil design in general, the dictate of a wicked, depraved, and malignant heart; and it may be either express or implied in law. 4 Bl.Comm. 199, 200. * * *'

\* \* \* \* \* \*

"In Tarvers v. State, 90 Tenn. 485, 16 S.W. 1041, this court said: '* * * If the act done was an unlawful act, and the doing of it was directly perilous to human life, and so known to the wrongdoer, that then there is implied such a high degree of conscious and willful recklessness as to amount to that malignity of heart constituting malice. The result may not have been intended, yet the deliberate and conscious doing of an act the probable consequence of which was death, amounts to murder at common law. This is the doctrine of Lee v. State, 1 Cold. [62], 66, and it is fully supported by the commonlaw authorities.' "

■■ If a deadly weapon is handled in any manner so as to make the killing a natural or probable result of such conduct, malice will be presumed or implied from the use of the weapon. Lewis v. State, 202 Tenn. 328, 304 S.W.2d 322. Proof of the use of a deadly weapon resulting in death raises a presumption of malice sufficient to sustain a conviction of murder in the second degree, unless it is rebutted by other facts and circumstances. Nance v. State, 210 Tenn. 328, 358 S.W.2d 327.

Upon the record in this case, the jury was fully justified in finding that the defendant acted with malice aforethought in the shooting which resulted in the death of Ernest Edward Julian.

■ The defendant next complains, in her second Assignment, that the State refused to permit her or her attorneys and experts to make a pre-trial examination of the bullet which killed Ernest Edward Julian. Although the State's obduracy in this respect was listed in her motion for a continuance, this record shows that no formal motion or request of any kind was ever made to the trial court for permission to examine this bullet. In the absence of any such request or motion, it is obvious that the trial court could not be put in error in this matter upon which he was never consulted in any way nor called upon to rule. Moreover, we know of no authority requiring the State to make an incriminated bullet available to the defense for pre-trial examination in a case involving death or injury by shooting.

■ The third Assignment of Error complains that the trial court refused to grant the defendant's motion for a continuance. The bases of the motion were (1) the State's refusal to permit defense examination of the lethal bullet, above noted, and (2) the alleged unwillingness and refusal of police officials and other witnesses to talk with the defendant's representatives investigating this case. The record shows that this trial began August 21, 1967, more than six months after the shooting and over three months after the indictments, and the motion for continuance was filed August 21, 1967, the day the trial began. There is no averment or indication in the record that the conditions complained of in the motion could have been altered to the advantage of the defendant by allowance of additional time for trial preparation. As a matter of fact, it affirmatively appears that every witness complained about, save two,

appeared and testified in the trial and were cross-examined by defense counsel.

It is elementary that a motion for a continuance is addressed to the sole discretion of the trial judge, and that his judgment will not be disturbed in the absence of a clear showing of prejudicial abuse of his discretion. This whole question was reviewed by our Chief Justice in Moorehead v. State, 219 Tenn. 271, 409 S.W.2d 357:

"So far as we can find, it has always been the rule in this State that a trial judge will not be put in error for denying a continuance unless it is shown that he has abused his discretion in doing so, because the granting or denying of a continuance is a matter which addressed itself to the sound discretion of the trial judge. Bass v. State, 191 Tenn. 259, 231 S.W.2d 707, and many others. This Court has held though that it will not disturb the exercise of this discretion by the trial judge unless something is developed in the after trial to show that the defendant might have been prejudiced in some way by the refusal to grant a continuance. State v. Rigsby, 74 Tenn. 554. In this case, that is the *Rigsby* case, the Court delivered an opinion, which was handed down eighty odd years ago, and made this very apt statement, which is worthy of quotation when the Court said:

" '* * * But, in the nature of things, much must be left to the discretion of a circuit judge, who is presumed to have, and who has in fact so large an experience upon the subject of criminal trials, who knows the shifts, and devices, and false pretenses to which defendants resort in the hope of escape from

justice, and that to disturb the exercise of his discretion, there should be something developed in the after trial to show that the defendant might have been prejudiced in some way by the refusal to grant a continuance.' "

In her fourth Assignment of Error, the defendant says that the trial court erred in permitting the Loudon County Sheriff to testify, over defense objections, what the lighting conditions were around the Fox home on other occasions, what those lighting conditions customarily were, what they were after the events in question, and how far the Sheriff could recognize people near the defendant's home on other occasions. And in the ninth Assignment of Error she complains of the court's actions in sustaining objections to the testimony of the defendant's witness, a surveyor and civil engineer who had made an examination of the defendant's property, with respect to whether the street lights and other lights in the immediate vicinity would produce darkened or shaded areas in the defendant's yard where the boys were shot. In our view the testimony referred to under these two Assignments of Error is wholly immaterial, for the reason that, as already noted, the defendant testified that she did not turn on her porch light, that she was not wearing her glasses, and consequently was practically blind when she opened fire with her pistol.

The fifth Assignment of Error relates to the testimony of the Police Chief concerning statements made by the defendant's husband in her presence, when the Chief arrived at the scene, expressing refusal or reluctance to surrender the pistol which the defendant had used. This testimony is altogether immaterial, for the record shows

that after a brief conversation between the Police Chief and the defendant and her husband, the latter surrendered the gun and the spent cartridges, and no question whatever is made concerning the identity of those articles.

The seventh Assignment of Error is that the court committed reversible and prejudicial error in refusing the defendant's attorneys the right to see the notes made by Police Chief Lane on the night of the shooting and which he used to refresh his memory while testifying as a prosecution witness at the trial. When defense counsel began cross-examination and asked the witness to see the notes he had been using, the State objected and the witness stated, "I would rather not let him have my notes." The court sustained the objection.

In 98 C.J.S. Witnesses § 362, the general rule upon this subject is stated as follows:

"As a general rule, the party, or his counsel, against whom the witness testifies has a right to see a writing used by the witness to refresh his memory or at least to insist that the witness not be permitted to refresh his recollection by the use of the writing unless it is made available for use on cross-examination. The witness may be compelled to submit the writing for inspection in order that opposing counsel may have the use of it on cross-examination. Where a proper request for opportunity to inspect has been made, it is error for the court to deny or refuse to enforce the rights of a party in this regard. Under the particular circumstances the error may, or may not, be prejudicial."

An exhaustive annotation on the subject of refreshing the recollection of witnesses by the use of memoranda or other writings is contained in 82 A.L.R. 2d, beginning at page 473. In Section 60 of the annotation (82 A.L.R.2d 557) it is said:

"While there is some authority to the contrary, it is the well-settled rule that the opposing party or counsel has the right on proper demand, to inspect, and use for purposes of cross-examination, any paper or memorandum which is used by a witness while on the stand for the purpose of refreshing his memory, and which does in fact tend to refresh his memory."

But this is not an absolute right. In Section 4 of the annotation (82 A.L.R.2d 489) it is said:

"The extent to which witnesses may refer to or read from memory-refreshing memoranda and the extent to which such memoranda may be inspected by counsel or jury is usually, if not always, a matter within the discretion of the trial judge, whose ruling will not be disturbed in the absence of an abuse of such discretion."

See also: 21 Am.Jur.2d, Criminal Law, § 339.

In the instant case, we do not think that this record demonstrates an abuse of discretion by the trial court, for the reason that the testimony of his witness regarding statements made to him by the defendant during his investigation was in no material aspect inconsistent with her theory of the case and her own testimony. That is, according to this witness, when he arrived at her home immediately after the shooting, the

defendant spontaneously told him that when she heard the noise outside she thought it was prowlers again, that she had been having much trouble with prowlers lately (and talked about Nix), and that she went out on the porch and began firing at the boys in self defense when they came around the house.

The eighth Assignment of Error is that the Chief of Police, the Sheriff and other city and county officers were permitted to testify, over defense objections, regarding statements made by the defendant when she had not been advised of her constitutional rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. When the Chief of Police arrived at the defendant's home following the shooting, he presented to her a mimeographed document entitled "Your Rights," at the end of which there was a paragraph styled "Waiver" and appropriate spaces for signatures of the accused and witnesses. After this instrument was read to the defendant by the Chief of Police and by her brother she signed it. Three days later she signed an identical document at the Sheriff's office. The statement therein regarding the right of an indigent person to assistance of counsel was: "You have this same right to the advice and presence of a lawyer, even if you cannot afford to hire one. We cannot ourselves furnish you a lawyer, but one will be appointed for you, if you wish, when you go to court."

The defendant's insistence is that that statement does not meet the requirements of *Miranda* with reference to advising indigent accused concerning their right to the presence and assistance of court-appointed counsel during custodial interrogation. With this we agree.

However, this affords the defendant no basis for complaint. In the first place, each "Waiver" which she signed contained the statement, among others, "I do not want a lawyer at this time." But more importantly, this record shows that she was not interrogated by any of the officers and that the statements she made to them were volunteered and spontaneous. In *Miranda* the Court said that such statements are admissible:

> "In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

The rule thus announced by the United States Supreme Court with regard to spontaneously volunteered statements is, in our opinion, fully applicable and controlling here.

The tenth Assignment of Error relates to the conduct of the trial court in making comments when ruling upon

objections and questioning witnesses. We have carefully read this record and have considered the cited instances of alleged improper intervention by the court.

In two recent cases our Supreme Court has made pronouncements particularly pertinent here. In English v. State, 219 Tenn. 568, 411 S.W.2d 702, the Court said:

> "The trial judge, of course, may examine witnesses and get the facts not clearly brought out for the information of the jury and himself, and to give the parties thereto an opportunity to make such explanation as the rules of evidence permit. The trial judge on the bench is not a prosecutor or a defender but he is there to see that justice is done between all the parties, and it frequently becomes necessary to ask questions and do things of the kind to see that all the facts are brought out so that a fair and impartial judgment may be rendered."

And the Court said in Collins v. State, 220 Tenn. 275, 416 S.W.2d 766:

> "This Court, in Parker v. State (1915) 132 Tenn. 327, 178 S.W. 438, L.R.A. 1916A, 1190, said the following:
>
> > " 'While it is true that the judge may ask questions now and then for the purpose of clearing up points that seem obscure, and supplying omissions, which the interests of justice demand, it is not proper that he conduct an extended examination of any witness, and particularly a prisoner on trial for his liberty or his life. Such a practice, if tolerated

by this court, would be far more hurtful to the administration of justice than the escape of many prisoners. It is essential that trials shall be managed fairly, and that trial judges shall not only be just to both sides, but that they shall observe in their demeanor an even tenor, so that an impartial state of mind may be apparent to all concerned.' "

Assuming without deciding that some of the incidents complained of may have to some extent transgressed the salutary principles enunciated in Canon 15 of the Canons of Judicial Ethics, and in *English* and *Collins,* supra, we are convinced that the defendant's right to a fair and impartial trial was not thereby prejudicially affected.

With respect to the eleventh Assignment of Error regarding the failure of the official court reporter to "take down and transcribe" the jury arguments of prosecution counsel, suffice it to say that the defendant was represented by able counsel retained by her; that this is not, therefore a "State-action" case; that the record shows that the Attorney General's argument was recorded and an "excerpt" therefrom is included in the Bill of Exceptions (and does not exceed the bounds of legitimate argument); and that the record does not disclose any request by defense counsel for a transcription of other portions of the prosecution's arguments. T.C.A. § 40-2037 provides in pertinent part:

"Upon the direction of the court in the case of an indigent defendant, or at the request of any party who has agreed to pay the fee therefor, a reporter designated by the court shall transcribe from the original

records such parts of the proceedings as are requested, * * *."

The defendant's twelfth Assignment of Error is that the verdicts returned by the jury in these two cases are inconsistent, and for that reason void. The defendant shot both of these young boys at the same time and place and under the same circumstances. Manifestly, she was actuated by a single purpose throughout this single transaction. There is no basis in fact or in reason to say that the defendant's motive and intent in shooting and wounding Richard Alexander was different from that which she entertained in the almost simultaneous shooting and wounding of Ernest Edward Julian. Quite obviously it cannot be said that one pull of the trigger was differently prompted or intended than the other; and this is so notwithstanding the defendant's testimony that she started shooting toward the ground as Richard Alexander approached, for the fact is that she was standing on the end of the porch and these boys were on the ground below her, and certainly both of her effective shots were necessarily directed generally downward, and all of her shots were fired in fairly rapid succession.

Under these circumstances, the question raised by the defendant's twelfth Assignment of Error is whether the two verdicts are reversibly inconsistent. This exact question has not been decided in this State. It has given us much concern.

An exhaustive annotation concerning inconsistency of criminal verdicts upon different indictments against the same defendant and tried at the same time appears in 16 A.L.R.3d 866 et seq. In Section 2 of this annotation, it is said:

"Consonant with the broad principle that consistency is unnecessary in criminal verdicts, the verdicts returned in a joint trial of two or more indictments or informations will not generally be reversed for inconsistency as between themselves. A few cases have apparently taken the contrary view, at least insofar as the result reached is concerned."

And in Section 3, citing many federal and state cases, the rule is stated that verdicts under two or more indictments tried jointly need not demonstrate rational consistency. One of the cases cited in support of this statement is United States v. Margoles (C.A.7th, 1961), 294 F.2d 371, cert. den. 368 U.S. 930, 82 S.Ct. 367, 7 L.Ed.2d 193. In that case, the defendant was acquitted on one indictment charging him with offering a thing of value to a federal judge with intent to influence the judge's decision in a pending matter, and was convicted under another indictment charging that he corruptly endeavored to influence an officer of a federal court in the discharge of his duty and (count 2) corruptly endeavored to obstruct the administration of justice, all in violation of a federal statute. Rejecting the defendant's contention that the verdicts were so inconsistent as to require reversal, the Court said:

"Consistency in verdicts is not necessary. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356. Defendant argues that this general rule is not applicable to the instant case because the jury must have acquitted defendant on the first indictment because it concluded that he was entrapped. But this is sheer speculation. The jury's action may have been prompted by leniency or other factors (Cf. United

States v. Maybury, 2 Cir., 274 F.2d 899, 902) or by its conception of the difference in the elements embodied in each offense and determination that there was a lack of proof of some factor requisite to establish the offense charged in the first indictment. In any event the 'why' of jury action is a subjective element but the propriety of that action is to be tested by objective factors considered in the light of controlling legal principles."

In Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed 356, disagreeing with the defendant's contention of reversible inconsistency, the Court said:

"That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters."

And, in a dissenting opinion by Mr. Justice Butler, citing many federal and state cases, he said:

"Where the jury's action reflects mere inconsistency in the consideration of the evidence which results in apparently illogical or unreasonable conclusions, courts will disregard differences and give effect to the verdict."

The annotator also cited United States v. Carbone (2nd Cir., 1967), 378 F.2d 420, wherein the defendants were acquited under one count of an indictment charging them with traffic in heroin, and were convicted under a second count charging them with conspiracy to violate a federal narcotics statute. Affirming, the Court said:

"The sole claim on appeal concerns the alleged inconsistency of the verdict; we are told at one point

in the brief that reversal on that score 'is not only harmonious with, but required by the holding of Dunn v. United States, 284 U.S. 390 [52 S.Ct. 189, 76 L.Ed. 356] (1932), as adumbrated by Sealfon v. United States, 332 U.S. 575 [68 S.Ct. 237, 92 L.Ed. 180] (1948)' and at another that *Dunn* should 'be overruled as unsound,' a task somewhat beyond our powers even if we had the will. The first branch of the argument seizes on the *Dunn* opinion's recital of the Government's contention that acquittal on the possession and sale counts was not necessarily inconsistent with the conviction on the nuisance count, 284 U.S. at 392, 393, 52 S.Ct. at 190. However, the opinion rested not on the ground of lack of inconsistency, but on the declared principle that 'Consistency in the verdict is not necessary', 284 U.S. at 393, 52 S.Ct. at 190. This was underscored by the approving quotation of Steckler v. United States, 7 F.2d 59, 60 (2 Cir. 1925), where in upholding a verdict Judge Learned Hand had been at pains to show that 'a plain inconsistency' existed.

\* \* \* \* \* \*

"Indeed, if the rule were otherwise, the Government would be entitled to have the jury warned that an acquittal on some counts might undermine a guilty verdict on others—almost the opposite of the standard instruction, which is obviously beneficial to criminal defendants, and which the judge gave here without objection. It is true, as both Judge Hand and Mr. Justice Holmes recognized, 7 F.2d at 60, 284 U.S. at 394, 52 S.Ct. 189, that allowing inconsistent verdicts in criminal trials runs the risk that an oc-

casional conviction may have been the result of compromise. But the advantage of leaving the jury free to exercise its historic power of lenity has been correctly thought to outweigh that danger."

While in the overwhelming majority of cases wherein the question of inconsistency of criminal verdicts was raised and decided, the defendant was convicted under one indictment and acquitted under another, both growing out of substantially the same transaction, the annotation referred to also cites cases wherein the defendant was convicted under separate indictments charging separate offenses allegedly committed at the same time and place and under the same circumstances.

Thus in Commonwealth v. Brown, 264 Pa. 85, 107 A. 676, the defendant was discovered burglarizing a store by the store owner's son, who called the police. While the son and a policeman were attempting to enter the store the defendant fired two shots from within, one killing the son and the other the policeman. The defendant was indicted and tried upon two separate indictments, one for each of the homicides, and both cases were tried together. The jury found the defendant guilty of first degree murder in killing the store owner's son and of second degree murder in killing the officer. The defendant insisted that the verdicts were fatally inconsistent. Affirming both convictions, the Court said: "While it is difficult to discover a reasonable basis for distinction between the verdicts in the two cases, the degree of the crime in each case was for the jury, and the fact that the conclusion differed is no reason for reversal." The same Court approved the same rule in Commonwealth v. Melissari, 298 Pa. 63, 148 A. 45.

■■ In Peek v. State, 213 Tenn. 323, 375 S.W. 2d 863, wherein the defendant was convicted of larceny and receiving and concealing the stolen property, under an indictment charging those offenses in separate counts, our Supreme Court recognized the rule enunciated in Dunn v. United States, supra, that consistency in a verdict is not necessary, but held, nevertheless, that inasmuch as there was ample evidence to support the conviction of receiving and concealing stolen property that verdict could be affirmed, and that the conviction of larceny of the same property could be disregarded as harmless error, provided that if the State did not agree the case would be reversed and remandded for a new trial. The Court was simply applying the rule that guilty verdicts upon separate counts in an indictment relating to the same act, transaction, or event, are inconsistent and mutually repugnant where the defendant could not, as a matter of law, be guilty of the offenses charged in the separate counts. 23A C.J.S. Criminal Law § 1403, pp. 1093-1095.

We have given this record careful and intensive consideration. It is free of prejudicial error. The judgment of the trial court is affirmed.

GALBREATH, J., did not participate in this case.

WALKER, P. J., concurs.