RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0071p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

       No. 09-6549

JAMES JONES,

        *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 07-20226-001—Samuel H. Mays, Jr., District Judge.

Decided and Filed: March 7, 2012

Before: MARTIN, SUTTON, and BALDOCK, Circuit Judges.[*]

_____

### COUNSEL

**ON BRIEF:** Barry J. McWhirter, THE McWHIRTER LAW FIRM, Memphis, Tennessee, for Appellant. Marlinee C. Iverson, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

_____

### OPINION

_____

BALDOCK, Circuit Judge. Defendant was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Defendant sought to suppress the seized firearm, but the district court denied Defendant's suppression motion. Thereafter, Defendant pleaded guilty to the felon in possession offense, preserving his right to appeal the suppression motion. The district court sentenced

---

[*] The Honorable Bobby R. Baldock, Circuit Judge of the United States Court of Appeals for the Tenth Circuit, sitting by designation.

1

Defendant under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e), to the mandatory minimum sentence of 180 months' imprisonment. Defendant now appeals, challenging both the denial of his suppression motion and his sentence under the ACCA. Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1), we affirm.

## I.

Memphis Police Officer Robert Strickland was on patrol on Latham Street in Memphis, Tennessee, an area known for extensive drug trafficking and violent crimes. He observed a group of men in front of an apartment house, and two males standing apart from the group. The two males appeared to be engaging in a hand-to-hand transaction. Officer Strickland had observed more than 200 hand-to-hand drug transactions in his nine years as a Memphis police officer, and he grew suspicious the men were exchanging cash for drugs. Strickland stopped and exited his car to investigate. Defendant immediately began running away "like a sprinter." Strickland called to Defendant to stop several times, but Defendant kept running. Officer Strickland gave chase, and observed Defendant drop a brown paper bag and other unidentifiable items. After chasing Defendant approximately 200 yards, Strickland caught up to him in an alley. Strickland pushed Defendant down and handcuffed him. As he was doing so, Strickland noticed Defendant's pants had fallen down and his belt was unfastened.

Two other officers soon arrived in response to Strickland's call for backup. One officer retraced Defendant's flight path to search for dropped items. He found an ammunition holder containing twenty-five rounds, an ammunition pouch, a holster, and a loaded .38 caliber revolver. Officer Strickland also found a brown paper bag containing a cold, open beer near where he observed Defendant drop a brown paper bag. The officers read Defendant his *Miranda* rights, and he admitted to possessing the firearm.

Defendant moved to suppress both the revolver and his confession, arguing Officer Strickland had no reasonable suspicion to detain Defendant and that his

confession was obtained by coercion. The district court denied the motion. The court found the officers' testimony to be credible, and Defendant's testimony not to be credible. The court held that Officer Strickland had reasonable suspicion Defendant was engaged in criminal activity based on his presence in a high crime area, the apparent hand-to-hand transaction, Defendant's flight, and Defendant's action in discarding various items during flight. The court also held Defendant's confession admissible, a holding Defendant does not challenge on appeal.

Defendant entered a conditional guilty plea to the felon in possession charge. His written plea agreement said if Defendant "is determined to be an Armed Career Criminal, the United States agrees to recommend a sentence of 180 months or the low end of the applicable advisory range, whichever is *higher*." The probation office identified three prior convictions as qualifying offenses under the ACCA. The first was a 1978 Tennessee conviction for "Assault to Murder 2nd Degree." The second and third were 1986 Tennessee convictions for "Burglary II" and "Assault to Murder 1 with Injury." The presentence report summarized the facts of the 1986 convictions as follows:

> The Affidavit of Complaint and Indictment (# 85 05021) indicated that at approximately 8:30 a.m. on 5/05/85, the defendant broke into the rear bedroom window of Bonnie Smith's and Curtis Walker's residence. Being confronted by Bonnie Smith, the defendant did leave the residence.
>   The Affidavit of Complaint and the Indictments (#85 05013, #85 05018, #85 05020) indicated that at approximately 9:30 p.m. on 5/05/85, the defendant returned to that residence. When Bonnie Smith answered the knock at the door, the defendant was at the door and pointed a large caliber pistol at Bonnie Smith in a threatening manner. Bonnie Smith ran screaming from her living room which caused Curtis Walker to come to the living room. The defendant then fired two shots at Curtis Walker and missed. Curtis Walker returned fire once with a shotgun and missed. The defendant then went to the rear bedroom window and fired at least two more shots at Bonnie Smith, striking her in the left hand, and also striking Ida Smith (17 months old) in the right buttocks and left shoulder.

Presentence Report at 11. At sentencing, the district court asked defense counsel if he had any objections to the "facts in the presentence report." Counsel only corrected the

date Defendant's mother died, and said to his knowledge no other facts needed correction. Based on the three prior convictions, the district court sentenced Defendant to the ACCA's mandatory minimum of 180 months. *See* 18 U.S.C. § 924(e)(1).

II.

Defendant first argues Officer Strickland had no "particularized and objective basis for suspecting that [Defendant] was committing or had committed a criminal offense when Officer Strickland made the scene and initiated the stop." On appeal from a motion to suppress, we review a district court's factual findings for clear error and its legal conclusions de novo. *United States v. Galaviz*, 645 F.3d 347, 352 (6th Cir. 2011). Defendant does not challenge the district court's factual findings, so our inquiry is a purely legal one.

We have identified three types of police-citizen encounters: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (quoting *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000)). Defendant concedes he was only detained, but argues he was detained without reasonable suspicion. Because reasonable suspicion is measured at the time of the detention, however, we must first determine when the detention began.

A person is seized within the Fourth Amendment's meaning when an officer "by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal citations and quotation marks omitted). Defendant argues the detention occurred when Strickland ordered him to stop and began chasing him. Defendant cites *United States v. Stittiams*, 417 F. App'x 530, 532 (6th Cir. 2011) (unpublished), where the defendant initially ignored an officer's demand to stop, but then complied once the officer threatened him. In *Stittiams*, we said the stop took place when the officer "chasing after Stittiams, demanded that Stittiams stop" and not when

the officer handcuffed him. *Id.* at 533. *Stittiams*, however, does not support Defendant's position. We went on in *Stittiams* to say a stop occurs when an officer "gives chase to a suspect while demanding that the suspect stop and the suspect *does stop*." *Id.* (emphasis added). The Supreme Court has held police pursuit is not a seizure until the suspect actually stops. *California v. Hodari D.*, 499 U.S. 621, 629 (1991). In *Hodari D.*, the Court said the term "seizure" "does not remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee." *Id.* at 626. Here, because Defendant did not comply with Strickland's commands to stop, he was not seized until Strickland physically restrained him by taking him down and handcuffing him.

Our next question is whether reasonable suspicion supported this stop. An officer may conduct an investigative stop only if he has "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Place*, 462 U.S. 696, 702 (1983). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted). Reasonable suspicion is based on the totality of the circumstances presented to the officer. *Id.* at 8. Here, Officer Strickland knew the following facts: (1) he was in a high-crime area, particularly known for drug activity; (2) Officer Strickland observed Defendant and another man engaged in an apparent hand-to-hand transaction; (3) Defendant ran when Strickland exited his car; (4) as Defendant was fleeing he threw several items to the ground.

These facts are sufficient to support reasonable suspicion. First, although presence in a high crime area "standing alone" cannot create reasonable suspicion of criminal activity, it is one relevant factor in the reasonable suspicion calculus. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id.* So the area's high crime nature raised at least some suspicion of criminal activity. Second, "unprovoked flight

upon noticing the police" is another relevant factor.  *Id.*  In *Wardlow*, the Supreme Court held officers had reasonable suspicion of criminal activity based solely on presence in a high-crime area combined with "headlong flight" from police.  *Id.*  So the first two facts available to Officer Strickland would suffice for reasonable suspicion.

This case, however, presents two additional, highly probative facts.  First, Officer Strickland had observed what appeared to be a hand-to-hand transaction consistent with a drug transaction.  We have upheld an investigatory stop based on almost identical facts.  *United States v. Paulette*, 457 F.3d 601, 606 (6th Cir. 2006).  In *Paulette*, we said, "[T]he officers had a reasonable suspicion that Paulette was engaged in criminal activity based upon his hand movements consistent with drug-dealing activity, efforts to evade the police upon noticing them, and presence in a high crime area."  *Id.*  Finally, if this were not enough, Strickland observed Defendant discard several items as he fled. Strickland could reasonably believe Defendant was attempting to rid himself of contraband, even if Strickland could not immediately identify the items.  Two other circuits have concluded a suspect's action in dropping an unidentified object contributes to reasonable suspicion.  *United States v. Carter*, 360 F.3d 1235, 1240 (10th Cir. 2004) (suspect dropped something while talking to officers); *United States v. Dupree*, 202 F.3d 1046, 1049 (8th Cir. 2000) (suspect dropped small object off a bridge before talking to police).  In short, based on the facts available to Officer Strickland when he detained Defendant, he had ample reasonable suspicion Defendant was engaged in criminal activity.  The district court correctly denied the motion to suppress.

### III.

We now turn to the validity of Defendant's sentence.  Ordinarily, the maximum penalty for violating 18 U.S.C. § 922(g) is ten years' imprisonment.  18 U.S.C. § 924(a)(2).  The ACCA, however, imposes a fifteen-year mandatory minimum for defendants with three or more prior convictions for a "violent felony or serious drug offense, or both, committed on occasions different from one another."  18 U.S.C. § 924(e)(1). We generally review de novo a district court's determination that an offense is a "violent felony" under the ACCA,  *United States v. Benton*, 639 F.3d 723, 729 (6th

Cir. 2011), as well as its determination that two offenses were "committed on occasions different from one another." *United States v. Hill*, 440 F.3d 292, 295 (6th Cir. 2006). But where, as here, the defendant fails to object to his sentence in the district court, we review only for plain error. *United States v. Eubanks*, 617 F.3d 364, 369 (6th Cir. 2010). To establish plain error, Defendant must show "(1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (internal quotation marks omitted).

### A.

Defendant first argues the district court erred in treating his two 1986 convictions as committed "on occasions different from one another." "[T]wo offenses are committed on different occasions under the [ACCA] if: (1) 'it is possible to discern the point at which the first offense is completed, and the subsequent point at which the second offense begins'; (2) 'it would have been possible for the offender to cease his criminal conduct after the first offense, and withdraw without committing the second offense'; *or* (3) 'the offenses are committed in different residences or business locations.'" *United States v. Paige*, 634 F.3d 871, 873 (6th Cir. 2011) (quoting *Hill*, 440 F.3d at 297–98) (emphasis added). Offenses are separate if they meet *any* of these three tests. *Id.* The district court did not address these factors in the sentencing hearing because Defendant did not challenge his sentencing under the ACCA. Nevertheless, we find no plain error.

"By failing to object to the presentence report, [Defendant] accepted all of the factual allegations contained in it." *Vonner*, 516 F.3d at 385. The factual summaries of Defendant's 1986 burglary and assault convictions readily demonstrate they were separate offenses under all three *Hill* tests. First, we can determine when the first offense was completed and when the second offense began. Defendant committed the burglary offense when he entered the residence without consent and with intent to commit a crime. *See* Tenn. Code Ann. § 39-3-403 (1982) (repealed 1989). The assault did not begin until an hour later, when Defendant pointed a pistol at Bonnie Smith in a threatening manner. *See* Tenn. Code Ann. § 39-2-103 (1982) (repealed 1989); *Huffman*

*v. State*, 292 S.W.2d 738, 742 (Tenn. 1956), *overruled on other grounds by State v. Irvin*, 603 S.W.2d 121 (Tenn. 1980). Second, Defendant easily could have withdrawn after the first offense. Defendant easily could have ceased his criminal conduct after the burglary and not committed the assault by simply not returning to the residence. Third, the offenses do not fail the "different occasion" requirement, even though they were not "committed in different residences." The third *Hill* test presumes offenses committed in different residences are committed on different occasions. But the reverse is not true. Offenses are not committed on the same occasion simply because they occurred in the same residence. For example, we have held that two offenses committed on the same day on different floors of the same house were separate offenses under the ACCA. *United States v. Wilson*, 27 F.3d 1126, 1131 (6th Cir. 1994). In *Wilson*, we said the defendant "could have halted his criminal rampage at any time. Yet he chose to continue selecting different victims in separate places." *Id.* Our reasoning in *Wilson* applies with equal force here, where Defendant left the house for an hour, during which time he could have abandoned his criminal pursuits. Instead, he chose to return and commit a further crime. The district court did not plainly err in treating Defendant's 1986 convictions as separate offenses under the ACCA.

B.

Defendant next argues the district court erred in failing to analyze whether all three of his prior convictions constituted "violent felonies" under the ACCA. As noted above, we review this issue only for plain error. *Eubanks*, 617 F.3d at 369. In determining whether a prior conviction constitutes a violent felony, we employ a categorical approach.[1] *Benton*, 639 F.3d at 729. Under this approach, we look at the "statutory definition of the offense and not the particular facts underlying the conviction." *United States v. Gibbs*, 626 F.3d 344, 352 (6th Cir. 2010). We then determine "whether that definition supports a conclusion that the conviction was for" a

---

[1]We analyze whether a conviction is a violent felony under the ACCA in the same way as whether a conviction is a crime of violence under U.S.S.G. § 4B1.2(a). *United States v. Meeks*, 664 F.3d 1067, 1070 n.1 (6th Cir. 2012).

violent felony. *United States v. Bartee*, 529 F.3d 357, 359 (6th Cir. 2008). The ACCA defines "violent felony" as any felony that:

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B)(i), (ii). In order to be a violent felony under this definition, a crime must do one of three things: fit into clause (i), be one of the specific offenses enumerated in clause (ii), or fit within the so-called "residual" provision of clause (ii).[2] *Sykes v. United States*, --- U.S. ---, 131 S. Ct. 2267, 2273 (2011).

1.

We first consider Defendant's 1986 conviction for second degree burglary. Burglary is an offense enumerated in clause (ii) of the "violent felony" definition. 18 U.S.C. § 924(e)(2)(B)(ii). The Supreme Court, however, has read this enumerated example to mean a "generic burglary," which the Court defined as "unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Taylor v. United States*, 495 U.S. 575, 599 (1990). In states which define burglary more broadly, such as by including entry into cars and boats, a burglary conviction is ordinarily not a violent felony under the ACCA. *Shepard v. United States*, 544 U.S. 13, 17 (2005). In 1986, the Tennessee second degree burglary statute defined "burglary in the second degree" as "the breaking and entering into a dwelling house or any other house, building, room or rooms therein used and occupied by any person or persons as a dwelling place or lodging . . . with the intent to commit a felony." Tenn. Code Ann. § 39-3-403 (1982) (repealed 1989). Unlike Tennessee's current burglary statute, the 1986 statute did not apply to motor vehicles and boats. *See* Tenn. Code. Ann.

---

[2] If, after applying the categorical approach, we conclude the statute embraces conduct falling outside the ACCA's definition of a violent felony, we may then apply a modified categorical approach. *United States v. McMurray*, 653 F.3d 367, 377 (6th Cir. 2011). Under this approach, we "may consider the indictment, guilty plea, or similar documents to determine whether they necessarily establish the nature of the prior conviction." *Id.* (quoting *Gibbs*, 626 F.3d at 352. Here, because we resolve Defendant's arguments under the categorical approach, we do not reach the modified categorical approach.

§ 39-14-402(4) (2012) (including nonconsensual entry into "any freight or passenger car, automobile, truck, trailer, boat, airplane or other motor vehicle"). The pre-1989 statute was at least as narrow as the *Taylor* court's definition of generic burglary, because it applied only to dwellings and occupied buildings. So the statute under which Defendant was convicted was a generic burglary statute. Because Tennessee's second degree burglary statute fits within the enumerated offenses in § 924(e)(2)(B)(ii), Defendant's burglary conviction counts as a "violent felony."[3]

### 2.

We next consider Defendant's 1986 conviction for assault with intent to commit first degree murder. Assault is not an offense enumerated in § 924(e)(2)(B)(ii). Thus, in order to be a violent felony, it must either have "as an element the use, attempted use, or threatened use of physical force against the person of another," § 924(e)(2)(B)(i), or else fit into the residual clause by "otherwise involv[ing] conduct that presents a serious potential risk of physical injury to another," § 924(e)(2)(B)(ii).

Under the ACCA, "the phrase 'physical force' means *violent* force—that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, --- U.S. ---, 130 S. Ct. 1265, 1271 (2010). The statute under which Defendant was convicted read: "Whoever shall feloniously and with malice aforethought assault any person, with intent to commit murder in the first degree, or shall administer or attempt to give any poison for that purpose, though death shall not ensue, shall . . . be imprisoned" for a period between five and twenty-five years. Tenn. Code Ann. § 39-2-103(a) (1982) (repealed 1989). The statute increased the permissible maximum sentence to life imprisonment if bodily injury resulted from the assault. *Id.* § 39-2-103(b). This statute does not necessarily require use of physical force, because

---

[3] In *United States v. Caruthers*, 458 F.3d 459, 475–76 (6th Cir. 2006), we considered whether Tennessee's pre-1989 burglary statute was generic under *Taylor*. We concluded the "Tennessee burglary statute" was non-generic because *third degree* burglary included unlawful entry into "any vault, safe, or other secure place," meaning it went beyond a "building or structure." *Id.* at 476 (citing Tenn. Code Ann. § 39-3-404(b)(1) (1982)). Our conclusion the statute was non-generic, however, was based solely on the third degree burglary provision. We did not consider whether the second degree burglary statute, taken separately, was generic. Thus, *Caruthers* has no bearing on our decision today.

it includes poisoning, which need not involve direct physical contact or force. We need not decide the issue because even if Defendant's conviction did not fit the use of physical force provision, it fits within the residual provision.

Defendant's conviction qualifies under the residual provision because it "otherwise involve[d] conduct that presents a serious potential risk of physical injury to another." § 924(e)(2)(B)(ii). The Supreme Court has held this provision applies only to crimes "that are roughly similar, in kind as well as in degree of risk posed" to the enumerated examples-burglary, arson, extortion, and crimes involving explosives. *Begay v. United States*, 553 U.S. 137, 143 (2008). In *Begay*, the Court held driving under the influence of alcohol was not a violent crime under the ACCA. The Court reasoned Congress would not have enumerated specific examples if it intended the provision to include *all* crimes presenting a risk of serious injury. *Id.* at 142. Furthermore, the Court concluded driving under the influence "differs from the example crimes-burglary, arson, extortion, and crimes involving the use of explosives-in at least one pertinent, and important, respect. The listed crimes all typically involve purposeful, 'violent,' and 'aggressive' conduct." *Id.* at 144–45.

In *Sykes*, the Court limited the application of *Begay*'s "purposeful, violent, and aggressive" standard. 131 S. Ct. at 2275–76. The Court noted the standard "has no precise textual link to the residual clause," and said the test should only be applied to crimes premised on strict liability, negligence, or recklessness. *Id.* at 2275. A more "categorical and manageable standard" the Court said, was the "risk levels" approach. *Id.* at 2275–76. This approach considers whether "the risk posed by the crime in question is comparable to that posed by its closest analog among the enumerated offenses." *Id.* at 2273 (quoting *James v. United States*, 550 U.S. 192, 203 (2007)). In *Sykes*, the Court proceeded to compare the crime in question-felonious flight from a law enforcement officer-to burglary and arson. *Id.* at 2274–75. Ultimately, the Court concluded felony vehicular flight was a violent felony under the ACCA because of the high risks involved. *Id.* at 2277.

In light of *Sykes*, our task is to determine how Tennessee's pre-1989 assault to murder statute compares to the crimes enumerated in the ACCA. As an initial matter, the crime has a "stringent *mens rea* requirement," meaning we need not apply *Begay*'s "purposeful, violent, and aggressive" test. *Sykes*, 131 S. Ct. at 2275. Instead, we compare the relative risks posed by the offense and the crimes enumerated in the ACCA. *Id.* at 2276. The statute under which Defendant was convicted contains two distinct provisions. The first provision includes 'assault . . . with intent to commit murder in the first degree.' Tenn. Code Ann. § 39-2-103(a) (1982). Prior to 1989, Tennessee had no statutory definition for simple assault, but followed the offense's common law definition. *State v. Deal*, 1988 WL 10075 at *2 (Tenn. Crim. App. 1988) (unpublished). Common law assault included "any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against the person." *Huffman*, 292 S.W.2d at 742 (quoting 6 C.J.S. Assault & Battery, § 60). Thus, conviction under the statute's first provision requires (1) an act tending to do injury, (2) the present ability to use actual violence, and (3) the intent to commit first degree murder. Such an offense presents an even higher risk of injury than the enumerated crimes of burglary and arson, which are directed at property, rather than persons. Arson poses a danger because it "entails intentional release of a destructive force dangerous to others," and "[b]urglary is dangerous because it can end in confrontation leading to violence." *Sykes*, 131 S. Ct. at 2273. But assault with intent to murder has as its *purpose* causing harm to a person. Serious harm is not a "collateral consequence," *id.*, but the crime's very object. Thus, the statute's first provision fits within the residual clause.

The statute's second provision applies when a person "administer[s] or attempt[s] to give any poison for that purpose," i.e., with intent to commit murder in the first degree. As with assault, attempting to poison someone with the intent that he die poses a serious risk of physical injury. The risk posed by intentional poisoning is at least as great as the risk posed by arson, burglary, or, as the Court addressed in *Sykes*, felonious flight from a law enforcement officer. Because both components of the statute

necessarily involve conduct with a high risk of injury, the offense fits within the residual clause.

3.

The analysis is slightly more complicated with Defendant's 1978 conviction for assault with intent to commit second degree murder. Tennessee law had no separate statutory provision for this offense. Rather, it was a lesser included offense within assault with intent to commit first degree murder. *Rowan v. State*, 369 S.W.2d 543, 546 (Tenn. 1963) ("An indictment for an assault with intent to commit murder in the first degree includes the lower grades of the offense, namely, assault or assault with intent to commit murder in the second degree . . . ."). A conviction for assault with intent to commit second degree murder could result when the elements of premeditation and deliberation, which are necessary for intent to commit first degree murder, were lacking. *Presley v. State*, 30 S.W.2d 231, 234 (Tenn. 1930); *State v. Saylor*, 74 Tenn. 586, 587 (Tenn. 1880); *State v. Tyms*, 1989 WL 37260, at *3 (Tenn. Crim. App. 1989) (unpublished). Yet conviction for assault with intent to commit second degree murder still required proof of assault (or poisoning) and malice aforethought. *Lay v. State*, 501 S.W.2d 820, 823 (Tenn. Crim. App. 1973) (overturning conviction for assault with intent to commit second degree murder based on absence of malice); *Tyms*, 1989 WL 37260 at *3 (noting assault with intent to commit second degree murder requires malice aforethought).

Malice is "an intent to do an injury to another, a design formed in the mind of doing mischief to another." *State v. Taylor*, 668 S.W.2d 681, 683 (Tenn. Crim. App. 1984). Malice can be either express, "where a person actually contemplates the injury or wrong which he inflicts," or implied, where "the act is committed deliberately and is likely to be attended with dangerous consequences." *Fox v. State*, 441 S.W.2d 491, 495–96 (Tenn. Crim. App. 1968). Regardless of whether assault with intent to commit second degree murder requires intent to kill or only implied malice, the offense is a violent felony under the ACCA. In Tennessee, implied malice requires "an intention to do any unlawful act which may probably result in depriving the party of life." *State v.*

*Thornton*, 730 S.W.2d 309, 317 (Tenn. 1987) (quoting *Bailey v. State*, 479 S.W.2d 829, 834 (Tenn. Crim. App. 1972)).  It may also be established by a deliberate act "likely to be attended with dangerous consequences."  *Fox*, 441 S.W.2d at 496.  An assault or poisoning committed with implied malice poses a "serious potential risk of physical injury to another."  18 U.S.C. § 924(e)(2)(B)(ii).  Such an offense poses a danger at least equal to the danger posed by burglary and arson, which both involve "indifference to . . . collateral consequences [having] violent-even lethal-potential for others."  *Sykes*, 131 S. Ct. at 2273.

Arson is a particularly instructive example.  Many arson statutes, following the common law, include the element of malice.  *See, e.g.*, 18 U.S.C. § 81 (2006) (defining arson as "willfully and maliciously set[ing] fire to or burn[ing] any building"); Tenn. Code Ann.  § 39-3-202 (1982) (repealed 1989) ("Any person who willfully and maliciously sets fire to . . . any building . . . shall be guilty of arson . . . ."); Mich. Comp. Laws § 750.72 ("Any person who wilfully [sic] or maliciously burns any dwelling house . . . shall be guilty of a felony . . . .").  *See also* Ohio Rev. Code Ann. § 2909.03(A)(1) ("No person, by means of fire or explosion, shall knowingly . . . cause, or create a substantial risk of, physical harm to any property of another without the other person's consent.").  The danger posed by a malicious assault or poisoning is at least equal to the danger posed by arson, which "entails intentional release of a destructive force dangerous to others."  *Sykes*, 131 S. Ct. 2273.  Thus, Defendant's conviction for assault with intent to commit second degree murder poses a serious risk of potential injury, and falls within the ACCA's residual clause.

In sum, all three of Defendant's prior convictions count as violent felonies.  Second degree burglary is a violent felony because it falls within the enumerated offenses in § 924(e)(2)(B)(ii).  Assault with intent to commit murder, whether in the first or second degree, is a violent felony under the residual clause of § 924(e)(2)(B)(ii).  Therefore, the district court did not commit plain error in sentencing Defendant pursuant to the ACCA.

AFFIRMED.