NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0583n.06

No. 07-4060

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Sep 02, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | On Appeal from the United States |
| CHARLES KIMBER, | ) | District Court for the Southern |
| | ) | District of Ohio |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

Before: MARTIN, BOGGS, and COLE, Circuit Judges.

**PER CURIAM.** Defendant Charles Kimber conditionally pleaded guilty to being a felon in possession of a firearm after the district court denied his motion to suppress evidence of a handgun, which Kimber claims was seized in violation of the Fourth Amendment. We find that the arresting officers' entry into the apartment building where Kimber was found with the handgun violated the Fourth Amendment. Accordingly, we reverse the district court's ruling on the suppression motion, vacate Kimber's conditional guilty plea and sentence, and remand.

**BACKGROUND**

**A. Underlying Events**

On November 11, 2006, between 11 p.m. and midnight, approximately six City of Cincinnati police officers, acting without a warrant, entered the Alms Hill Apartments at 2525 Victory Parkway in Cincinnati, Ohio. The Alms Hill Apartments is a former hotel that has been converted into a

residential apartment building. The officers were members of the District 4 Violent Crime Squad, which is charged with investigating drug complaints, drug activity, shootings, and robberies. They had no reason to believe that any specific criminal activity was occurring at the Alms Hill Apartments that evening, other than their generalized knowledge that the building was a crime "hot spot."[1] Rather, on account of inclement weather, they had decided to visit the building in lieu of patrolling the city streets.

The officers entered through the building's back door, which featured a keycard-based lock mechanism; as they did not have a keycard, they forced the door open. Upon entering, the officers proceeded through the rear vestibule to the lobby. At some point thereafter, Kimber entered the building through the back door and approached the lobby. When Kimber saw the officers, he appeared surprised and attempted to turn and walk away. As he did so, one of the officers saw the handle of a handgun protruding from Kimber's jacket pocket. The officers searched Kimber and found a loaded Cobra .380-caliber pistol on his person. They then placed him under arrest for carrying a concealed weapon; Kimber told the officers that he was a convicted felon.[2]

Subsequently, the officers drafted sworn criminal complaints in Hamilton County Municipal Court. Thereafter, the prosecution was referred to federal authorities, and Kimber was charged in

---

[1] One of the officers testified at the suppression hearing that he had been on the premises about fifty times and had made arrests there for drugs, prostitution, firearms possession, and robberies.

[2] Kimber also informed the officers that he had a small bag of crack cocaine on his person, which the officers located. There is some inconsistency in the record as to whether Kimber told the officers about the crack before or after he was Mirandized. This is immaterial for purposes of the present appeal, however, as the federal indictment here does not include any drug offenses.

a two-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C.

§ 922(g) and being a felon in possession of a firearm in a school zone in violation of 18 U.S.C.

§ 922(q)(2)(a). Kimber filed this motion to suppress.

**B. Evidence Presented at the Suppression Hearing**

The district court held hearings on the motion on April 26, 2007 and May 1, 2007. The

government offered the testimony of two of the arresting officers, Kenneth Grubbs and Brian

Stewart, as well as certain documentary evidence described below. Kimber did not testify.

**1.** *Consent to Enter*

Grubbs testified that at the time of the arrest in November 2006, the Alms Hill Apartments

were owned by Downtown Property Management ("DPM"), a private entity, but acknowledged that

he was "aware that the building ha[d] changed ownership three times since 2005." Grubbs explained

that when property owners "have problems with people trespassing on their property," they place

what is known as a "trespass letter" on file with the Cincinnati Police Department authorizing the

police to "act as their agent[s] whenever [they] come onto their property." The government placed

into evidence a trespass letter signed by the manager of DPM reading, in relevant part:

> I, Kera Raminemi, being the owner or person in control of the premises located at
> 2525 Victory Parkway in Cincinnati, Hamilton County, Ohio, do hereby name all
> sworn members of the Police Department as my agents for the limited purpose of
> enforcing criminal trespassing laws on the above property, which includes the land[,]
> all buildings and structures, walkways and parking lots.
>
> I agree to have prominently displayed on my property, signs notifying persons of my
> restrictions imposed upon entry onto my property. I hereby authorize any member
> of the Police Department to warn a person found to be in violation of the sign to
> leave the property. Any person who ignores said warning, or returns to the property

without proper permission, shall be subject to arrest by members of the Police Dept. with my permission and full support. . . .[3]

This authorization shall remain in effect until a written notice of revocation is provided.

Grubbs testified that this letter "reflect[s] the most accurate correspondence from [DPM] to the Cincinnati Police Department." However, as the court noted, the letter was dated January 31, 2007 – over two months *after* Kimber's arrest.

On cross-examination, Grubbs testified as follows:

Q. Ha[d] there been any previous letters?

A. From what I recall, yes, there ha[d] been. I personally don't keep them in my possession. We have – well, they have a cop team, they call them cop team officers, who basically keep these letters on file in their office.

Q. But you would not know if you had permission to be on the property on November 11th?

A. I do. I am aware that I knew that we had permission to be on that property that particular day.

Q. But this is not evidenced by this letter?

A. By the date of this letter, it does not go back to the November date.

Q. Okay. Now –

THE COURT: Let me ask a question. Maybe I'm anticipating. Was there a letter that covered . . . November 11th, 2006?

---

[3]  There is no evidence in the record that any such sign was posted at the Alms Hill Apartments. Kimber argues that the posting of such a sign was a condition precedent to the grant of permission to enter the property, and that the alleged failure to post a sign thus rendered any trespass letter inoperative. He cites no legal authority for this argument, however, and in any event, he did not make it before the district court, so it is waived.

THE WITNESS: I am aware that, yes, there was a letter on file at the time, yes.

THE COURT: And where is that letter? Why is this letter being offered then? Where's the letter that covers the period?

THE WITNESS: Well, I do know that periodically what our cop team officers do is they will go back to properties and businesses and basically renew a letter. I know that there have been problems, I'm aware of problems that have occurred over at the Hamilton County Courthouse where if a letter is older, that judges have not liked the letter being very old. They want an up-to-date letter.

THE COURT: Well, we don't have an up-to-date letter in this case, do we?

THE WITNESS: Well, this letter – yes, it is dated after the date of the incident.

THE COURT: So it is your word – are you aware, personally, that there was a letter in the file that covered this date of November 11th, '06?

THE WITNESS: I am aware of a letter. I can give you a little more explanation, if you would like. I'm also aware that security officers who are in charge of the property – the property has its own private security. I've been personally asked on numerous occasions within the last two years, I can go back, of them asking us to please come to the property, and they have a problem with trespassers.[4]

Stewart, meanwhile, testified as follows:

A. The riffraff coming into the building was [a] problem, so we had a trespassing letter that was signed by the representative of the building to give us access to come in and arrest anyone who was there unlawfully.

Q. Okay. Now, do you know if there was such a letter giving you permission to be there on file on November 11th, 2006?

A. Yes, yes.

---

[4] There is no evidence in the record that the private security company tasked with patrolling the building gave the officers open-ended permission to enter the property at will, or that the security company had the authority to grant such permission.

Q. Had you had any conversations with the private security element that also worked at that location?

A. Yes.

Q. Had they ever said anything to you about your presence at that location?

A. That it was needed and they went on and gave us other information about other apartments in the building that were a problem.

Subsequent to the hearing, but before the motion was decided, the government entered into the record a second trespass letter with materially identical operative language. This letter was dated April 15, 2004 – approximately two years and seven months before Kimber's arrest. The letter identified the relevant property as the Alms Hill Apartments and was signed by "Candice Ratcliff." It did not mention DPM and listed a different contact address and telephone number from the trespass letter from DPM.

## 2. *Manner of Entry*

Regarding the officers' manner of entry, Grubbs testified:

Q. And can you tell Your Honor how [the back door of the Alms Hill Apartments through which the officers entered] can be accessed?

A. At the particular date and time, I would say about a week, a week prior to this particular night or so, myself and officers doing basically the same thing, trying to investigate the trespass complaints and complaints of drug activity, we were actually shown by an individual. We were trying to get in the door. It was locked and an individual came up and said here's how you get in the door. And that individual turned and kicked the door at the bottom and then pulled the door open.

Q. And were you able to access it without any kind of security card?

A. Yes.

Meanwhile, Stewart testified that "[t]he door . . . is supposed to be secure and you're supposed to use a pass card to gain entry through that door, [but f]or some odd reason, you can yank the door and it will open."

### 3. *Kimber's Residence*

Kimber entered into evidence sworn state-court complaints signed by Stewart that describe Kimber as residing at "2525 Victory Pkwy Apt 1008" – the address of the Alms Hill Apartments – as well as an Ohio non-driver identification card issued on June 12, 2006 identifying Kimber's address as "2525 Victory Pkwy."[5]

Grubbs testified that he himself never inquired as to Kimber's residence, but that it "was . . . determined" through unspecified means that Kimber did not live at the Alms Hill Apartments, although his aunt did. Meanwhile, Stewart testified that at the scene, "Mr. Kimber, himself, verbally" gave 2525 Victory Parkway as his address, although Stewart said that Kimber did not give this information to *him* at that time; rather, he "th[ought Kimber] gave it to Officer Grubbs." Stewart further testified that during an interview at the station-house, Kimber said that "he goes in and out of 2525 Victory, but he doesn't live there."[6]

---

[5] To obtain an Ohio non-driver identification card, an applicant must present documents sufficient to establish the person's "resident street address." Ohio Department of Public Safety - Bureau of Motor Vehicles, Acceptable Documents List, http://publicsafety.ohio.gov /links/bmv2424.pdf (last accessed July 22, 2010).

[6] While it is not competent "evidence," Kimber's sister gave an unsworn statement at Kimber's sentencing hearing that he had lived at the Alms Hill Apartments for a year or more and that she had visited him there often.

## C. District Court Decision

The district court found the testimony of Grubbs and Stewart with regard to their encounter with Kimber "highly credible and corroborated." *United States v. Kimber*, No. 1:07-CR-00019, 2007 WL 1299266, at *3 (S.D. Ohio May 1, 2007). Accordingly, the court concluded that "as soon as Stewart saw the gun in plain view, [the officers] . . . immediately had probable cause to make a weapons arrest." *Id.* at *4.

As for Kimber's assertion that the officers had no right to enter the Alms Hill Apartments in the first place, the court concluded: "[t]he [o]fficers were present in a common area at the premises in the context of a valid trespassing investigation. The Court accepts the testimony that the location is a crime 'hot spot,' and that the [o]fficers' presence was justified, and indeed welcomed by the owner of the building." *Ibid.* In a footnote, the court elaborated:

> At the May 1, 2007 hearing the government proffered a letter from Alms Hill building management, dated April 15, 2004, which shows the [previous] property owner authorized Cincinnati Police to enforce trespassing laws on the property. This letter, taken together with the more recent letter from the current property owner, dated January 31, 2007, and the [o]fficers' testimony, leaves no doubt that [they were] authorized to enter the building on November 11, 2006.

*Id.* at *4 n.1 (internal citations omitted). The court declined to make a finding as to whether Kimber was a resident of the Alms Hill Apartments, reasoning that the issue was irrelevant in light of the court's finding that the officers were "authorized to enter the building."

After his suppression motion was denied, Kimber entered a conditional guilty plea, reserving the right to appeal the denial of the motion. Following his sentencing to 77 months' imprisonment and three years of supervised release, he timely appealed.

**STANDARD OF REVIEW**

When reviewing a district court's decision on a motion to suppress, "we use a mixed standard of review: we review findings of fact for clear error and conclusions of law de novo." *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009) (quoting *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008)). A factual finding is clearly erroneous "when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009). When a district court has denied a motion to suppress, we "review[] the evidence in the light most likely to support the district court's decision." *Ibid.* (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999) (internal quotation marks omitted)).

In particular, the district court's decision turned on the issue of consent.[7]   With respect to that issue, "the ultimate question of whether there was consent" is a legal conclusion which we review de novo, though underlying factual findings and credibility determinations are, as always, entitled to deference.  *United States v. Moon*, 513 F.3d 527, 536-37 (6th Cir. 2008).

---

[7] To be precise, the district court's opinion did not use the word "consent" at all.  However, we conclude from the statements that the officers' presence was "authorized" and "welcomed by the owner of the building" that the district court intended to rely on the consent exception to the Fourth Amendment's warrant requirement.  *Kimber*, 2007 WL 1299266, at *4 & n.1.  It appears that the district court may in fact have overstepped the bounds of the consent exception in concluding from, inter alia, the testimony that "the location is a crime 'hot spot'" that "the [o]fficers' presence [in the building lobby] was *justified*."  *Id.* at *4 (emphasis added).  There is, of course, no broad exception to the Fourth Amendment's warrant requirement for home entries that are "justified," even by probable cause that evidence of a crime lies within.  *See Donovan v. Dewey*, 452 U.S. 594, 599 n.6 (1981) ("Absent consent or exigent circumstances, a private home may not be entered to conduct a search or effect an arrest without a warrant.").  The question before us, therefore, is whether the record supports the district court's narrower determination that valid consent was given.

**DISCUSSION**

**A. Consent to Enter**

**1.** *Legal Principles*

"To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable per se, one 'jealously and carefully drawn' exception recognizes the validity of searches with the voluntary consent of an individual possessing authority." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)) (internal citations omitted). Upon a suppression motion, "[i]t is the government's burden, by a preponderance of the evidence, to show through clear and positive testimony that . . . valid and voluntary consent to the search was obtained." *United States v. Davis*, 283 F. App'x 370, 373 (6th Cir. 2008) (quoting *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999)).

A search pursuant to third-party consent will not violate the Fourth Amendment so long as the party granting consent had either actual authority or apparent authority to do so. *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006). To possess actual authority, a third party must "possess[] common authority over or other sufficient relationship to the premises . . . sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Apparent authority exists if "the facts available to the officer[s] at the moment [would] warrant a man of reasonable caution in the belief that [there was] consent[ from a] party [that] had authority over the premises . . . ." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (internal quotation marks omitted); *see also Morgan,* 435 F.3d at 663 ("Apparent authority is judged by an objective standard. . . . [It exists] if the officers

reasonably could conclude from the facts available that the third party had [actual] authority to consent to the search." (quoting *United States v. Hunyady*, 409 F.3d 297, 303 (6th Cir. 2005)).

The district court's opinion did not specify whether its conclusion that the officers were "authorized to enter" was premised on a theory of actual authority or a theory of apparent authority; nor can we clearly discern as much from context. Since "we are free to affirm . . . on any basis supported by the record," *Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002), we therefore examine the record to determine whether it supports a finding of consent under either theory.

**2.  *Actual Authority***

There is no question that the only party with actual authority to consent to the search was DPM, the building's contemporaneous owner.[8]  At the time of the search, the former owner who signed the 2004 trespass letter no longer "possess[ed] common authority over or other sufficient relationship to the premises . . . sought to be inspected," *Matlock*, 415 U.S. at 171; therefore, the district court's reliance on the 2004 letter is inconsistent with a theory of actual authority. Furthermore, it goes without saying that even a party with authority over the premises at the time of a search cannot grant consent retroactively. *See United States v. Lewis*, 231 F.3d 238, 241 (6th Cir. 2000).  Accordingly, the 2007 letter from DPM on which the district court relied is not direct evidence of consent under this theory.

---

[8] Although a landlord does not generally possess authority to grant consent to the search of a tenant's private living quarters, *Chapman v. United States*, 365 U.S. 610, 616 (1961), a landlord obviously may enter and control his building's common spaces and may thus consent to a search of such spaces. *See United States v. Elliott*, 50 F.3d 180, 186 (2d Cir. 1995); *United States v. Kelly*, 551 F.2d 760, 764 (8th Cir. 1977).

Thus, any finding of consent under an actual-authority theory must turn on "the [o]fficers' testimony." *Kimber*, 2007 WL 1299266, at *4 n.1. However, neither Grubbs nor Stewart specifically testified that *DPM* had given the Cincinnati Police Department consent to enter the building *prior to* the arrest. Grubbs testified that he was "aware that [he] knew that [the officers] had [*someone's*] permission to be on that property that particular day" and that "there was a letter [from *someone*] on file at the time" of the arrest, without stating that the permission and the letter of which he spoke came from DPM, as opposed to a previous owner (e.g., the "Candice Ratcliff" mentioned in the 2004 trespass letter) or another person or entity. Stewart, meanwhile, initially testified that the officers "had a trespassing letter that was signed by the representative of the building," although he did not specify when the police "had [the] letter" of which he spoke; nor did he make clear whether that letter was from a representative of the building's owner when Kimber was arrested, as opposed to a prior owner. When Stewart was subsequently asked whether there was "a letter giving . . . permission to be there on file *on November 11th, 2006*" (emphasis added), he answered "Yes, yes," but, once again, he did not state that the letter on file at that time was from DPM.

Thus, we are faced with a record devoid of *any* "clear and positive testimony" of timely consent from a person or entity with actual authority. *Davis*, 283 F. App'x at 373. On this record, a finding that the preponderance of the evidence establishes such consent would be clear error. Accordingly, we cannot affirm on the ground that the officers had consent to enter from a party with actual authority.

### 3. *Apparent Authority*

We might still affirm if we could conclude that the officers entered the building with the consent of a party with apparent authority. Whether the officers "had . . . a reasonable basis to conclude that a third party had authority to consent to a search [is a] question[] of law and we therefore review [it] de novo." *United States v. Grayer*, 232 F. App'x 446, 448 (6th Cir. 2007) (quoting *United States v. Hudson*, 405 F.3d 425, 431 (6th Cir. 2005)). On this record, we cannot conclude that, officers "of reasonable caution" would have believed there was consent from a party with actual authority. *Rodriguez*, 497 U.S. at 188.

First, just as the after-the-fact January 2007 letter from DPM is largely irrelevant under an actual-authority analysis, it is irrelevant under an apparent-authority analysis, since that letter was not among "the facts available to the officer[s] at the moment" of the search. *Ibid.*

Regarding the 2004 letter from "Candice Ratcliff," as the Supreme Court emphasized in *Rodriguez*, the existence of a statement of consent from *someone* claiming authority is not always enough. *See ibid.* ("Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry."). This circuit has repeatedly sounded the same theme. *See United States v. Purcell*, 526 F.3d 953, 963 (6th Cir. 2008) ("[A]pparent authority cannot exist if there is ambiguity as to the asserted authority and the searching officers do not take steps to resolve the ambiguity."); *United States v. Waller*, 426 F.3d 838, 846 (6th Cir. 2005) ("If the agents do not learn enough, if the circumstances make it unclear whether . . . the person giving

consent [had actual authority], then warrantless entry is unlawful without further inquiry." (internal quotation marks omitted)).

Thus, while there is no dispute that the 2004 letter was a facially satisfactory statement of consent, we do not believe that "a man of reasonable caution" would have relied on it as authoritative under the circumstances. *Rodriguez*, 497 U.S. at 188. Grubbs knew that the Alms Hill Apartments had "changed ownership three times since 2005," so there was reason to "doubt [the 2004 letter's continuing validity] and not act upon it without further inquiry," *ibid.* – especially where Grubbs was aware that "problems . . . ha[d] occurred over at the Hamilton County Courthouse" when his fellow officers had attempted to rely on outdated trespass letters.

Finally, while the officers testified that they had *someone's* consent to enter the property at the time of the search, their testimony did not establish whom this consent had come from or how long before the arrest it was given. If the officers' testimony that "there was a letter" of unspecified age and provenance on file reflected the full extent of their knowledge at the time of the arrest – and the record provides no basis to believe otherwise – we do not believe that such vague knowledge would justify a "man of reasonable caution" in acting. Accordingly, we cannot affirm on the ground that the officers had consent from a party with apparent authority. This exhausts the possibilities for affirmance under the Fourth Amendment's consent exception.

**B. Reasonable Expectation of Privacy**

The government argues that we may affirm the district court's decision not to suppress the evidence on the alternative ground that Kimber lacked a reasonable expectation of privacy. In *United States v. Carriger*, 541 F.2d 545 (6th Cir. 1976), we held that "a tenant in [a locked]

apartment building has a reasonable expectation of privacy in the common areas of the building not open to the general public." *Id.* at 549, 550-51; *see also United States v. Heath*, 259 F.3d 522, 534 (6th Cir. 2001) ("[T]he most casual reading of *Carriger* reveals that *any* entry into a locked apartment building without permission, exigency or a warrant is prohibited.").[9] The government argues that the present case falls outside our holding in *Carriger*, and that Kimber therefore had no constitutionally protected expectation of privacy, because (1) he was not a tenant or resident of the Alms Hill Apartments, and (2) the building was not sufficiently secure to qualify as "locked."

**1. *Kimber's Residence***

While *Carriger* spoke explicitly of "tenants," the Supreme Court has since clarified that one's "status as an overnight guest [in someone else's home] is alone enough to show . . . an expectation of privacy in the home that society is prepared to recognize as reasonable." *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) (overnight guest of resident in duplex apartment); *see also*

---

[9] *Carriger*'s holding has "never [been] overruled in this circuit" and thus "remain[s] controlling," *United States v. Dillard*, 438 F.3d 675, 683 (6th Cir. 2006), notwithstanding the fact that "[t]he Sixth Circuit stands alone in taking th[is] position . . . ." *United States v. Miravalles*, 280 F.3d 1328, 1332 (11th Cir. 2002). *See United States v. Nohara*, 3 F.3d 1239, 1241-42 (9th Cir. 1993) (no reasonable expectation of privacy in locked apartment hallway); *United States v. Concepcion*, 942 F.2d 1170, 1172-73 (7th Cir. 1991) (no reasonable expectation of privacy in locked hallway of six-unit dwelling); *United States v. Holland*, 755 F.2d 253, 255-56 (2d Cir. 1985) (no reasonable expectation of privacy in locked hallway of duplex); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977) (no reasonable expectation of privacy in locked apartment hallway); *but cf. United States v. Villegas*, 495 F.3d 761, 771-72 (7th Cir. 2007) (Rovner, J., dissenting) ("When the common hallway of a multi-unit building is secured, . . . a resident of that building reasonably may expect that a non-resident – including a police officer – can lawfully enter the building only with the permission of himself or another resident."); Sean M. Lewis, Note, *The Fourth Amendment in the Hallway: Do Tenants Have a Constitutionally Protected Privacy Interest in the Locked Common Areas of Their Apartment Buildings?*, 101 Mich. L. Rev. 273 (2002) (discussing cases from various circuits and identifying our rule, as established in *Carriger*, as the superior one).

*United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009) ("The Sixth Circuit has generously construed the Fourth Amendment as protecting nearly all overnight guests, even when the guest occupies a common area in the apartment that is not private from other residents."). Thus, the controlling inquiry is not whether Kimber was a tenant of the Alms Hill Apartments, as the government suggests, or even a resident – but rather, whether he was, at the very least, an overnight guest.

Kimber argues that the record establishes that he was a resident. He points to the sworn state-court criminal complaint signed by Stewart listing Kimber's address as "2525 Victory Pkwy Apt 1008," as well as Kimber's official state identification card listing the same address. The government, by contrast, relies on Grubbs's testimony that it "was . . . determined" – by unspecified persons, and in an unspecified manner – that Kimber did not live at the Alms Hill Apartments (but that Kimber's aunt did), and Stewart's testimony that, while Kimber told someone at the scene of the arrest that he lived in the Alms Hill Apartments, he changed his story after arriving at the station-house, where he stated that "he goes in and out of 2525 Victory, but he doesn't live there."

Irrespective of what this evidence establishes regarding Kimber's *residence*, none of it suggests that Kimber was not, at the very least, an overnight guest of someone who resided at the Alms Hill Apartments (where, after all, he was arriving shortly before midnight). Accordingly, we cannot affirm the district court's order on this basis.

2. *The Building's Security*

The Government also argues that "*Carriger* is distinguishable because [the] common area of that building was secure," while "[t]he rear entrance door [of the Alms Hill Apartments] was

equipped with a key pad security lock that was easily and frequently circumvented with a shove or kick." Appellee Br. at 14-15.

In *Carriger*, we held that the tenant of a locked apartment building possessed a reasonable expectation of privacy even though the officer used *no force at all* to enter; in that case, the officer accessed the building by waiting for two workmen to enter and following them inside before the door closed. 541 F.2d at 548. We observed that "[w]hether the officer entered forcibly . . . or by guile through a normally locked entrance door, there can be no difference in the tenant's subjective expectation of privacy, and no difference in the degree of privacy that the Fourth Amendment protects." *Id.* at 551. In other words, the appropriate inquiry was not whether it was *physically possible* for an officer to gain entry, but rather, whether the tenant would have expected him to do so and whether society would regard such expectation as reasonable. *Cf. United States v. Dillard*, 438 F.3d 675, 682 (6th Cir. 2006) ("A person has [a legitimate] expectation of privacy if he has a subjective expectation of privacy, and if society is prepared to recognize that expectation as objectively reasonable." (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring))).

If it was subjectively unexpected and objectively unreasonable for the officer in *Carriger* to circumvent a lock by following workmen into the building, it was certainly no less so for Grubbs, Stewart, and their colleagues to circumvent a lock by forcing open the door in this case. With regard to Kimber's subjective expectation of privacy, there is no evidence that Kimber knew or should have known that the lock could be circumvented in this manner. Nothing in the record suggests that the lock's fallibility was common knowledge to residents and guests of the Alms Hill Apartments. To

the contrary, Grubbs testified that when he had visited the building the previous week, he was unable

to gain entry until an unidentified person (not necessarily a resident or guest) demonstrated the door-

opening technique to him. This is affirmative evidence that the lock's fallibility was not open and

obvious, and therefore, that it had no bearing on Kimber's subjective expectation of privacy. The

government's assertion that the lock was "frequently circumvented" has no basis in the record.[10]

Further, we have no doubt that society would recognize Kimber's subjective expectation of

privacy as reasonable. The Anglo-American tradition has long regarded the forcing open of locked

doors by law enforcement officials with special disapproval (even where, unlike here, the police have

a warrant supported by probable cause). *See Semayne's Case*, 5 Co. Rep. 91a, 91b, 77 Eng. Rep.

194, 195-96 (K.B. 1603) ("[T]he law . . . abhors the destruction or breaking of any house (which is

for the habitation and safety of man) by which great damage and inconvenience might ensue . . . .");

*see also Wilson v. Arkansas*, 514 U.S. 927, 931-34 & n.2 (1995) (discussing common-law and

colonial authorities). Accordingly, we cannot affirm on this alternative basis, either.

---

[10] We do not mean to imply that the mere existence of a lock mechanism will always create a subjective expectation of privacy. In *United States v. Conti*, 361 F.2d 153 (2d Cir. 1966), a case that we distinguished in *Carriger*, the Second Circuit found no reasonable expectation of privacy where "[t]he apartment building had a hall door which was meant to be kept locked, but there was testimony that the door was often open, and even if closed, its lock was broken . . . ." *Carriger*, 541 U.S. at 549 (citing *Conti*). Similarly, in *United States v. Miravalles*, 280 F.3d 1328 (11th Cir. 2002), the Eleventh Circuit distinguished *Carriger*, noting that the officers had entered through a door that was "designed to be locked and function with an electronic card mechanism," but the lock "at times did not work and was not working when the officers arrived," such that "[t]here was nothing to prevent anyone and everyone who wanted to do so from walking in . . . ." *Id.* at 1329, 1333. In those cases, the total, habitual lack of security would have been obvious to all residents, thus precluding any subjective expectation of privacy. Here, by contrast, the record does not suggest that residents (or guests) would have had any reason to believe that the lock was compromised.

## CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's denial of Kimber's

motion to suppress, **VACATE** Kimber's conditional guilty plea and sentence, and **REMAND** for

further proceedings not inconsistent with this opinion.