NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0258n.06

Case Nos. 19-4175/4176

## UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

FILED
May 27, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| Plaintiff-Appellee, | ) | |
| v. | ) | |
| CHARLES ROGERS (19-4175); SHAWN FORD (19-4176), | ) | **O P I N I O N** |
| Defendants-Appellants. | ) | |

**BEFORE: CLAY, McKEAGUE, and MURPHY, Circuit Judges.**

**McKEAGUE, Circuit Judge.** A string of robberies took place in Cleveland, Ohio, in March 2018. After the final failed attempt, Charles Rogers and Shawn Ford were arrested and later convicted for those robberies under the Hobbs Act in violation of 18 U.S.C. § 1951(a) and for weapons offenses in violation of 18 U.S.C. § 924(c). They jointly appeal the denial of their motion to suppress evidence recovered from a Chevrolet Equinox Rogers was driving the night of their arrest. Individually, Ford appeals the denial of his motion to suppress evidence recovered from his residence and Rogers raises an insufficiency of evidence claim.

Finding no merit in their arguments, we **AFFIRM**.

**I**

*A. MetroPCS Robberies*

In late March 2018, a series of four robberies took place within a week at MetroPCS stores in Cleveland, Ohio. Each robbery had the same pattern: two men with masks, guns, and blue latex gloves would enter the store, demand money, and then drive away. However, the fourth and final robbery did not go as planned. An off-duty police officer happened to be inside the store at the time and chased the robbers after they ran out of the store. Instead of stopping, the robbers shot at the police officer, who fired back and hit their vehicle.

*B. Seizure of Rogers and Ford*

Shortly after the last robbery occurred, Officer Steven Schmitz overheard on his radio that a nearby MetroPCS store had been robbed and that an off-duty police officer exchanged gunfire with the robbers. The dispatcher stated that the robbers had driven off in a gold or tan mid-sized SUV "resembling a Chevy Equinox" and that there were three people in the vehicle. Then, about 20 minutes after the last robbery occurred and two miles away from the scene, Schmitz passed a gold SUV, a Chevrolet Equinox, matching the description of the vehicle. He also thought he saw bullet holes on the driver-side door. The Equinox turned onto Fuller Avenue, and when Schmitz followed, he saw the SUV parked on the side of the road and two men and one woman walking away from it.

Schmitz drove up to the individuals, informed them that the police were searching for a vehicle that matched the Equinox, and asked them to place their hands on the hood of his car. The individuals were later identified as Charles Rogers, Shawn Ford, and Gloria Rosario. Other officers quickly arrived on the scene, and Schmitz began speaking to the first man, who said he didn't know his social security number and that his name was "Robert" Rogers. Schmitz checked

with dispatch, who confirmed that "Robert" Rogers had an outstanding arrest warrant. Rogers told Schmitz that he had been driving the vehicle but also that he was "high on Molly," so officers placed Rogers in the back of a patrol car while the investigation continued. After further questioning regarding his age and identity, "Robert" Rogers revealed that his real name was Charles Rogers.

Next, other officers began speaking with Ford and Rosario, who gave information that conflicted with Schmitz's observations. Ford told one of the officers that he had just come out of his house, that he only knew Rogers as "Chucky," that he didn't know the name of the woman with them, and that he had just been released from prison for robbery. Rosario claimed that the Equinox was hers, even though it was registered to her sister, and that it had been parked on the street and not recently driven. Dispatch confirmed that the Equinox was registered to Savannah Young, who did not have a valid license, and not Rosario. Shortly thereafter, officers determined Rosario had outstanding arrest warrants and removed her from the scene.

The officers contacted dispatch, who told them that the two suspects in the robbery were wearing all black clothing. Officers noticed that despite the cold and rainy weather, Ford and Rogers were shirtless but wearing jackets. Around this time, they also noticed bullet marks on the side of the Equinox and latex gloves in plain view. At this point, the officers still believed that "Robert" Rogers was on the scene and had an outstanding warrant, and knew they were receiving conflicting information from Rogers and Ford. The officers continued their investigation while waiting for the off-duty police officer who shot at the suspected robbers to arrive at the scene,

which occurred about 20 minutes after the stop initially began.  He was unable to identify either Rogers or Ford as the robbers.

At this point, having realized that "Robert" Rogers was Charles Rogers, who did not have a warrant, the police decided to release Rogers and Ford because they had no arrest warrants and could not be identified as the robbers.  However, Rogers admitted to driving the Equinox without a license, and so officers decided to write him a citation.  Additionally, the officers decided to tow the vehicle because the registered owner was not present, the registered owner did not have a valid driver's license, Rosario had no proof of ownership and had been arrested for outstanding warrants, and Rogers and Ford both did not have valid driver's licenses.  Pursuant to the Cleveland Police Department's towing policy, officers began to inventory the contents of the vehicle before towing it, which took place while other officers were writing Rogers's citation.  While conducting the inventory search, officers found latex gloves, a spent shell casing, and suspected narcotics.  This occurred about 35 minutes after the initial stop of Rogers and Ford.  Based on the suspected narcotics, the officers stopped the inventory search to wait for the crime scene unit to arrive and arrested Rogers and Ford.

### C. Search of Ford Residence

Another officer, Lisette Gonzalez, was involved in the MetroPCS robbery investigation and requested recordings of calls made by Ford from jail after his arrest.  On April 3, 2018, Ford called one of his friends known as "Cellbug" and asked him to take some clothing out of Ford's house.  Later in the call, Ford told him to "take everything" out of the house.  Based on these calls, the evidence recovered from the Equinox, and other evidence tying Ford to the robberies, officers

obtained a search warrant for Ford's residence on April 19, 2018. The residence was two stories, with one unit per story, and the warrant was for the upstairs unit only.

When officers arrived to search the upstairs unit, they spoke to Ford's stepfather. He told the officers that his family owned the upstairs and downstairs unit and lived in both units, and that Ford sometimes stayed in the downstairs unit. Gonzalez indicated to Ford's stepfather that she would obtain a warrant for the downstairs unit, but he agreed to contact Marcella Berry, Ford's grandmother, who had keys to the downstairs unit. Once Berry arrived, she confirmed she kept property in the house, had "24-hour access," and gave consent to the officers to search the downstairs. Berry had keys to doors and closets in the unit, which she unlocked for the officers. Officers seized a firearm that Berry said was hers, as well as ammunition, clothing, and shoes consistent with the ones used in the robberies.

### D. Denial of Motions to Suppress and Conviction

On June 5, 2018, Rogers and Ford were indicted under 18 U.S.C. § 1951(a) for a total of five counts of conspiracy to commit Hobbs Act robbery and the robberies themselves, as well as three counts of using, carrying, brandishing and/or discharging a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c).

Prior to trial, Rogers and Ford moved to suppress the evidence recovered from the Equinox, and Ford also moved to suppress the evidence recovered from the search of his residence. The district court denied both motions. The case proceeded to trial, which lasted six days, and the jury convicted Rogers and Ford on all counts on July 1, 2019.

This appeal followed.

## II

### A. *Motion to Suppress Evidence from Arrest*

Rogers's and Ford's primary claim on appeal concerns the denial of their motion to suppress evidence from their March 27, 2018 arrest. The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. "On appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Sweeney*, 891 F.3d 232, 235 (6th Cir. 2018). We review all evidence "in the light most favorable to the government." *United States v. Ickes*, 922 F.3d 708, 710 (6th Cir. 2019).

Rogers and Ford make four challenges to the events of March 27: first, they argue that the police did not have reasonable suspicion to initially stop them; second, that the police arrested them without probable cause when they handcuffed them and placed them in the back of a police car; third, that the police were dilatory in their investigation and detained them for too long after the off-duty police officer failed to identify them as the robbers; and fourth, that the police conducted an invalid inventory search of the Equinox which revealed suspected narcotics, latex gloves, and other evidence related to the robberies. We analyze each challenge in turn.

#### 1. Initial Investigatory Stop

Rogers and Ford challenge their initial detention, arguing there was no reasonable suspicion for Schmitz to stop them. An officer may conduct an investigatory stop with "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012) (quoting *United States v. Place*, 462 U.S. 696, 702 (1983)). This is known as a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 20–21 (1968). The reasonable suspicion standard requires "'considerably less than proof of

wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Based on the "totality of the circumstances of each case" officers must have "a particularized and objective basis for suspecting legal wrongdoing." *United States v. Herndon*, 501 F.3d 683, 691 (6th Cir. 2007) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Here, there was more than enough proof for reasonable suspicion for Schmitz to stop and question Rogers and Ford. Schmitz knew that a MetroPCS store had been robbed, that an off-duty police officer exchanged gunfire with the robbers, and that the getaway vehicle was a gold or tan mid-size SUV "resembling a Chevy Equinox." About 20 minutes later and only a few miles from the crime scene, Schmitz passed an Equinox that matched that description with a visible bullet hole. Schmitz's decision to stop Rogers and Ford and begin questioning them was proper. *See, e.g.*, *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (upholding a *Terry* stop when an officer observed a vehicle matching the description of a getaway vehicle close in time and distance to the robbery); *United States v. Craig*, 198 F. App'x 459, 463 (6th Cir. 2006) (same).

2. Alleged Arrest

Next, Rogers and Ford argue that by handcuffing them and placing them in police cars, the police arrested them without probable cause. But these actions did not rise to the level of an arrest because they did not exceed what is permissible under *Terry*. Even when conducting *Terry* stops, officers are permitted to take reasonable precautions, especially in situations involving suspected violent offenders. For example, in *United States v. Marxen*, police knew that the defendant's vehicle matched the description of a getaway vehicle in a robbery eleven days earlier and boxed in his car with multiple police cars, even though the defendant didn't match the description of the

robber. 410 F.3d 326, 329–30 (6th Cir. 2005). Immediately once the defendant's vehicle was stopped, the officers removed him from his car and placed him in handcuffs, and we held that this was a permissible detention under *Terry*. *Id.* at 332 (holding that "officers may take reasonable precautions for their own protection" when conducting *Terry* stops and that "[s]uch reasonable precautions include drawing and displaying weapons, the immediate removal of the occupants from the subject vehicle, and placing the occupants in handcuffs"); *see also Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814–15 (6th Cir. 1999) (finding that only reasonable suspicion was required when officers detained defendants at gunpoint, handcuffed them, and placed them in patrol cars).

Here, the Equinox matched the description of the robbers' getaway vehicle, the robbers had exchanged gunfire with an off-duty police officer, and Rogers and Ford were giving conflicting and false answers to questions by officers. The officers were able to take reasonable precautions for their safety, which included handcuffing Rogers and Ford and placing them in the back of a police car, and those precautions did not elevate the stop to an arrest.

3. Investigation and Detention

Next, Ford and Rogers argue that the officers failed to diligently investigate them before the off-duty police officer arrived and that they impermissibly extended the stop after the off-duty police officer failed to identify them as the robbers. Again, we disagree. While conducting a *Terry* stop, the police must have "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

And that is what the officers did here. After stopping Rogers and Ford, the police engaged in standard investigative practices, including asking Rogers and Ford for their identification and

where they were coming from, to which they got conflicting and false responses. After over 10 minutes of questioning, the officers knew that the Equinox matched the description of the car used in an attempted armed robbery and had a bullet hole in the door, that there were blue latex gloves in the car, that the three individuals were giving conflicting and false information about their identities and the Equinox's location, that both men were shirtless and wearing jackets on a cold and rainy night, and that Rogers had given a false name, apparently had an outstanding warrant, admitted he was high, and had driven the Equinox without a license. At this point, it was reasonable for the officers to continue their investigation by holding Rogers and Ford until the off-duty police officer arrived, which occurred about 20 minutes after the stop began.

Rogers and Ford claim that as soon as the off-duty police officer failed to identify them, they should have been released. But the police did not violate the Fourth Amendment in holding them for 10 or 15 minutes longer to confirm they did not have warrants and begin writing Rogers a traffic citation. Rogers and Ford correctly note that after the police officer failed to identify them and the officers confirmed that neither of them had arrest warrants, they decided to release them, which was about 30 minutes after the stop began. But because Rogers had been driving without a license, the officers decided to write him a citation and tow the vehicle. While one officer was writing Rogers's citation, other officers began the inventory search. These activities justified extending the duration of the stop, as the purpose had shifted from investigating whether they had robbed the MetroPCS store to writing Rogers a traffic citation and conducting the inventory search. Indeed, one officer was still in the process of writing the citation when the suspected narcotics were found.

We have approved brief detentions in similar cases. *See, e.g.*, *United States v. Ellis*, 497 F.3d 606, 612–14 (6th Cir. 2007) (finding that an additional 8 minutes of detention after a

22-minute traffic stop was not unreasonable when the occupants of a car gave dishonest and conflicting answers to officers); *United States v. Perez*, 440 F.3d 363, 372–73 (6th Cir. 2006) (upholding a 90-minute detention when officers were continuously investigating whether defendants were involved in a drug transaction).

And cases holding a detention unreasonable support the conclusion that the situation here was different. For example, in *United States v. Davis*, 430 F.3d 345 (6th Cir. 2005), officers held a driver for 30 minutes while waiting for a drug sniffing dog, which was a "minimally intrusive" way of investigating whether Davis's car contained narcotics. *Id.* at 355. Once that dog failed to detect drugs, the officers held the defendant for another hour awaiting a second dog, which we held was an unreasonable detention because after the first dog sniff, "the officers' suspicions that Davis was in possession of narcotics were dispelled." *Id.* at 356.

Here, the police were permitted to detain Rogers and Ford while waiting for the off-duty police officer to arrive, and the key difference between the facts here and *Davis* is that once the off-duty police officer failed to identify Rogers and Ford as the robbers, the purpose of the stop transitioned to writing Rogers a traffic citation and conducting an inventory search of the vehicle prior to towing it. Rogers and Ford were not being detained or investigated for robbery at that point, and their brief detention while the traffic citation was being written and the police began their inventory search was supported by our prior cases and not unreasonable.

### 4. Inventory Search of Equinox

Finally, Rogers and Ford challenge the inventory search of the Equinox itself, arguing that the officers failed to comply with their towing policy.[1] But "inventory searches are now a well-

---

[1] The government argues that Rogers and Ford lack standing to make this challenge because they cannot show a legitimate expectation of privacy in the vehicle. *See Rakas v. Illinois*, 439 U.S. 128, 138–48 (1978). This is not

defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). So long as the searches follow an established routine, they are upheld. *See United States v. Lumpkin*, 159 F.3d 983, 987 (6th Cir. 1998); *see also Florida v. Wells*, 495 U.S. 1, 4 (1990). And here, the police complied with their policy, which involved filling out a tow form and searching specific areas of the vehicle and not others. The officers also had authority to impound the vehicle under local Cleveland ordinances, which permit towing a vehicle when it has been operated by someone without a license, and we have held that "[a] vehicle is lawfully seized and, thus, subject to an inventory search if it is lawfully impounded." *United States v. Snoddy*, 976 F.3d 630, 634 (6th Cir. 2020).

Rogers's and Ford's main argument in opposition is that the officers did not strictly follow all components of their towing policy. In particular, the "safekeeping" portion of the policy states that "officers shall make a good faith attempt to contact the owner" before towing the vehicle "so the owner may move the vehicle." However, the officers on the scene already knew the owner did not have a valid driver's license, and there was no one else on the scene who could drive away the vehicle. Perhaps the officers could have contacted the owner to see if there was someone who could drive the vehicle, but they were not required to do so under their policy.

Additionally, Ford argues that the "Vehicle/Tow Supplement Form" was not completed because it failed to note that the reason of the tow was safekeeping, that it did not state there was notice given to the owner, and that it did not fully document all property in the vehicle. But Ford's

---

jurisdictional standing, but instead the ability to show a Fourth Amendment violation. *See United States v. Smith*, 263 F.3d 571, 581–82 (6th Cir. 2001).

Here, we need not answer the standing question. In cases where we find the search would be constitutional even if the defendants had standing, we may simply affirm on that basis and avoid ruling on standing. *See United States v. Calhoun*, 834 F. App'x 128, 131 (6th Cir. 2020). And because we conclude that the inventory search arguments made Rogers and Ford are without merit, we forgo a standing analysis.

arguments are contradicted by the officer's testimony. The search of the Equinox began as an inventory search, but after the suspected narcotics were found, the inventory search was halted. Because there were suspected drugs in the vehicle, a different, more thorough property search would be conducted, and the officers decided to arrest Rogers and Ford. Therefore, the reason for the tow was listed as "arrest and process," not "safekeeping," and the form did not fully list all property within the Equinox because the more complete search was to take place later by the crime scene unit. And, even if there were minor violations of the towing policy, they would not justify suppression here. *See, e.g.*, *United States v. Hockenberry*, 730 F.3d 645, 660–61 (6th Cir. 2013) (upholding an inventory search even though "it appear[ed] that the officers failed to strictly follow all of the requirements of the Youngstown Police Department's inventory search policy" because "the law allows for some flexibility and practical judgment in how such searches are carried out"); *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (noting that "failure to follow through with standard procedures does not necessarily render the search unreasonable"). The officers had authority to tow the vehicle and did not violate their policy by doing so, and so Rogers and Ford cannot show a violation of the inventory search exception to the warrant requirement.

### B. Search of Ford's Residence

Ford also appeals the denial of his motion to suppress evidence recovered from his residence on April 19, 2018. The residence was a two-story home, and Ford has one challenge for each story, arguing that the upstairs search was based on stale information and that the police did not get proper consent from his grandmother to conduct the downstairs search. We address each challenge in turn.

1. Staleness

"The standard of review for determining the sufficiency of the affidavit 'is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited.'" *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Davidson*, 936 F.3d 856, 859 (6th Cir. 1991)). When the district court denies a motion to suppress, this Court reviews all evidence in a light most favorable to the government. *United States v. Galloway*, 316 F.3d 624, 628 (6th Cir. 2003). Since the issuing judge's decision is entitled to great deference, "[t]his circuit has long held that an issuing magistrate's discretion should only be reversed if it was arbitrarily exercised." *United States v. Terry*, 522 F.3d 645, 648 (6th Cir. 2008) (quoting *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc)).

While Ford was being held in jail after his arrest, he made phone calls to various individuals. On April 2, 2018, Ford told a man named "Cellbug" to "take everything" out of Ford's residence, and on April 6, 2018, Ford spoke to his sister who told him that she gave "Cellbug" "everything." Officer Lisette Gonzalez obtained and listened to these phone calls, among others, on April 16, 2018. Ford claims that the warrant for the upstairs unit was based on stale evidence because the search was not conducted until 17 days after Ford's phone call suggesting he was planning on disposing of incriminating evidence. He claims that because he told "Cellbug" to dispose of "everything," there was no reason to expect anything to be found 17 days later.

A warrant does not contain stale information if the affidavit still contains facts that indicate "a 'fair probability' that evidence of a crime will be located on the premises of the proposed search." *United States v. Jenkins*, 396 F.3d 751, 761 (6th Cir. 2005) (quoting *United States v. Bowling*, 900 F.2d 926, 930 (6th Cir. 1990)). "The staleness inquiry is tailored to the specific

13

circumstances in each case." *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006). Relevant factors to consider in evaluating this question include: the amount of time between the events in the affidavit and the application for the warrant; the nature of the crime; whether the criminal is nomadic or entrenched; whether the items to be seized are perishable or likely to be kept; and whether the location to be searched was merely a convenient location or a secure operational base. *Id.* at 572–73.

Here, we see no error in the district court's conclusion that the affidavit was not stale. The crimes took place over a one-week period, involved firearms, and followed the same general pattern, suggesting that they involved planning and coordination between the two robbers. The place to be searched was Ford's residence, increasing the likelihood that evidence related to the crime would be found there as there was no indication Ford "move[d] frequently with the hope of avoiding detection or capture." *See United States v. Goodwin*, 552 F. App'x 541, 545 (6th Cir. 2014). The items in the warrant were clothing and firearms, which are durable and nonperishable (compared to evidence like drugs).

Furthermore, the affidavit set out detailed facts describing the robberies, the getaway vehicle, and the evidence recovered from the search of the Equinox. It noted that Ford received mail at the upstairs unit of the home and asked his friend "Cellbug" to get rid of his clothing there. That information, along with Officer Gonzalez's statement that robbers frequently keep robbery proceeds, firearms, and ammunition in their homes, was sufficient to indicate a "fair probability" that evidence of the robbery would be found in the upstairs unit. *See Jenkins*, 396 F.3d at 761. Even if weeks had passed since the phone call with "Cellbug," the other information in the affidavit was sufficient to uphold the warrant. *See Abboud*, 438 F.3d at 572 ("[T]he length of time between

the events listed in the affidavit and the application for the warrant, while clearly salient, is not controlling." (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998))).

Ford's arguments to the contrary are unavailing. Ford claims that because the affidavit did not mention the April 6 phone call where Ford's sister told Ford that she had given Cellbug "everything," it is stale. But an affidavit must be "judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *Allen*, 211 F.3d at 975 (en banc). Even if Ford's sister said that she had given Cellbug "everything," the contents of the affidavit together more than support the magistrate's conclusion that there was a substantial basis to conclude that there was probable cause that evidence of criminal activity would be found at Ford's residence.

2. Consent

The police did not have a warrant for the downstairs unit, but instead obtained consent to search the unit from Ford's grandmother, Marcella Berry. Ford argues that Berry did not have authority to consent to that search. "A search pursuant to third-party consent will not violate the Fourth Amendment so long as the party granting consent had either actual authority or apparent authority to do so." *United States v. Kimber*, 395 F. App'x 237, 243 (6th Cir. 2010) (per curiam). Actual authority exists if the third party "possesse[s] common authority over or [has an]other sufficient relationship to the premises . . . sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974); *accord United States v. Moore*, 917 F.2d 215, 223 (6th Cir. 1990). One sufficient relationship is the "mutual use of the property by persons generally having joint access or control for most purposes," because a person who shares such access has "assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 171 n.7. Conversely, apparent authority exists if the facts suggest that an officer "of reasonable caution"

would believe that there was "consent [from a] party [that] had authority over the premises." *Kimber*, 395 F. App'x at 243 (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)). "A search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had authority to consent to the search." *United States v. Gillis*, 358 F.3d 386, 390–91 (6th Cir. 2004).

This Court has recognized that "'the ultimate question of whether there was consent' is a legal conclusion which we review de novo, though underlying factual findings and credibility determinations are, as always, entitled to deference." *Kimber*, 395 F. App'x at 243 (quoting *United States v. Moon*, 513 F.3d 527, 536–37 (6th Cir. 2008)). On a suppression motion, "[i]t is the government's burden, by a preponderance of the evidence, to show through clear and positive testimony that . . . valid and voluntary consent to the search was obtained." *United States v. Davis*, 283 F. App'x 370, 373 (6th Cir. 2008) (quoting *United States v. Worley,* 193 F.3d 380, 385 (6th Cir. 1999)).

Whether Berry had actual authority to consent to the search is a close question, but we need not answer it because Berry had apparent authority. If an officer reasonably believes that a third party had "joint access or control for most purposes," that consent is valid under apparent authority even if it turns out as a factual matter that the party did not have that type of joint access or control. *United States v. Penney*, 576 F.3d 297, 307 (6th Cir. 2009) (quoting *Rodriguez*, 497 U.S. at 181). And here, the facts known to the officers at the time of the search were sufficient for an officer of reasonable caution to conclude that Berry had that level of access or control.

After the officers began the search of the upstairs unit, Officer Gonzalez spoke to a resident of the building named Steward, who said he was Ford's stepfather. Steward said that Ford lived in the downstairs unit and that Ford's grandmother, Berry, also lived in the downstairs unit with

him and had a key. Steward also explained that the downstairs unit was "basically her house" and that Berry would "usually be down there," but because Steward's sister-in-law was in a "situation," Berry was taking care of his sister-in-law's children in another home. The other members of the family called Berry to have her come over and let the officers into the unit. Once Berry arrived, Gonzalez began asking her about her relationship to the downstairs unit. When officers asked if Berry lived in the unit, she said "yes and no," but told officers that her personal property was in the home, that she had keys to the home, and that she had "access in and out." She also confirmed that she had recently changed the locks on the doors and that she went to the unit "every now and again."

These facts were sufficient for a reasonable officer to conclude that Berry had "joint access or control for most purposes" and so could consent to the search.[2] In analyzing whether a third party has apparent authority to consent to a search, "no one fact . . . is determinative." *United States v. Hudson*, 405 F.3d 425, 442 (6th Cir. 2005). We have looked to factors such as whether the third party has keys, whether the third party has more than "limited" access to the home, whether the third party maintains property in the home, whether the third party lives in the home, whether the third party accesses the home when the primary owner is not present, and whose name appears on the lease. *Penney*, 576 F.3d at 307–08; *Gillis*, 358 F.3d at 390–91; *United States v. Jenkins*, 92 F.3d 430, 436–37 (6th Cir. 1996); *see also United States v. Ayoub*, 498 F.3d 532, 539

---

[2] Information found during the course of a search can help confirm a good-faith belief in apparent authority. *Penney*, 576 F.3d at 307–08 ("Once at the residence with Bowman, officers observed further evidence that she was not a mere overnight guest at [the defendant's] house."). Here, as Berry was escorting the officers, she confirmed she regularly came over to water her plants, discussed the substantial amount of personal property she kept in the home, and confirmed that "everything" in certain locked closets was hers, including a firearm. These statements, along with the clear familiarity with the home that Berry displayed, helped cure the ambiguity (if any) that existed regarding her access and control of the home.

(6th Cir. 2007) (noting that "mere handymen, landlords, hotel staff, or former tenants" would "lack common authority over [a] residence" when they only have keys and limited access).

While the district court cited *United States v. Hudson*, 405 F.3d 425, 442 (6th Cir. 2005), to suggest that the inquiry is limited to whether the "police could reasonably conclude that the party consenting to the search lived at the premises," our cases confirm the inquiry is broader than that. *See, e.g.*, *Ayoub*, 498 F.3d at 539 (finding apparent authority even though the third party did not live at the home because she "had actual control of the house . . . and had a key" to the residence). Indeed, when first articulating the doctrine of apparent authority, the Supreme Court discussed a past case and recognized that circumstances could exist that would allow police to believe that a hotel clerk "had general access to or control" over a person's hotel room sufficient to provide apparent authority to officers. *Rodriguez*, 497 U.S. at 187–88 (finding that in that specific case, because the police "knew that the room was rented and exclusively occupied by the defendant," apparent authority could not be found). Therefore, if a hotel clerk could conceivably have authority over a hotel room in certain circumstances, then living at the residence cannot be a requirement. Instead, the key question is whether, after considering all facts known to the officers, they could reasonably conclude that a third party has "common authority" over the residence—even if later discovered facts show that the third party lacked that authority. *Gillis*, 358 F.3d at 390–91.

While we have not confronted a situation exactly like this one before, we have found apparent authority in similar situations. *See, e.g.*, *Ayoub*, 498 F.3d at 539 (finding apparent authority even though the third party did not live at the home because she "had actual control of the house . . . and had a key" to the residence); *Penney*, 576 F.3d at 308 (finding that the defendant's girlfriend had apparent authority to consent to a search of his house, even though she didn't live

18

there, because she had property inside the home, took care of things around the home, and had access to the house); *Gillis*, 358 F.3d at 390-91 (finding the defendant's girlfriend had apparent authority even though she no longer lived at the residence and did not have keys because she maintained access and visited the home from time to time); *cf. United States v. Tatman*, 397 F. App'x 152, 167 (6th Cir. 2010) (finding no apparent authority where the police knew that the third party "did not live in the house, had no right to be in the house, and had no authority to let" the police into the house, as well as knowledge that the third party "no longer had any possessions in the house"). These cases illustrate the contextual, fact-specific inquiry that aims to determine whether a third party has access to the residence sufficient for police to conclude that they could validly consent to a search.

And here, the police could reasonably make that conclusion about Berry. When asked directly whether she lived in the unit, Berry was equivocal, telling officers "yes and no." But the police had heard multiple times from Steward that the unit was "her house" and Berry went on to confirm that she had keys to the unit, recently changed the locks on the doors, accessed the home to water her plants, and kept personal property in the home. Further, we have recognized that "cohabitation need not be uninterrupted to support a reasonable belief in common authority." *Penney*, 576 F.3d at 308. These factors, taken together, suggested that Berry had more than "limited access" to the residence and instead possessed the "common authority" sufficient for an officer of reasonable caution to believe she could consent to the search. *See Gillis*, 358 F.3d at 390.

## C. *Insufficiency of Evidence*

Finally, Rogers appeals the denial of his motion for acquittal, arguing that the government presented insufficient evidence of his identity at trial. Proving insufficiency of evidence is a high

bar, as Rogers bears the burden of showing that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Maya*, 966 F.3d 493, 498 (6th Cir. 2020) (quoting *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016)). That is, if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the verdict must be upheld. *See United States v. Paulus*, 894 F.3d 267, 274 (6th Cir. 2018) (quoting *United States v. Persaud*, 866 F.3d 371, 380 (6th Cir. 2017)).

Rogers cannot meet his burden, as the evidence presented against Rogers at trial was substantial. It included GPS tracking information showing Rogers at the scene of the first robbery, social media videos showing Rogers wearing a distinctive sweatshirt that a witness saw one of the robbers wearing, testimony from Rosario indicating that she lent the Equinox to Rogers and that he came back a few hours later with a lot of cash in small bills, and testimony from Rosario stating that the pants and shoes one of the robbers was wearing in a surveillance video belonged to Rogers. This, along with the evidence recovered from the Equinox and Rosario's testimony that the Equinox didn't have bullet holes, latex gloves, or shell casings inside of it when she lent it to Rogers, are more than sufficient to uphold Rogers's conviction.

Rogers's two arguments against this conclusion are that the government failed to present any direct eyewitnesses that could identify him and that his DNA was not found on the evidence recovered from the Equinox or at the stores. We note that "this Court has never held that eyewitness evidence is needed to secure a conviction," and requiring eyewitnesses for masked criminals would be a difficult task indeed. *See United States v. Parks*, 278 F. App'x 527, 536 (6th Cir. 2008). Rogers simply fails to grapple with the substantial circumstantial evidence against him. For example, Rogers's DNA was found on the sweatshirt that matched the sweatshirt one of

the robbers was wearing.  In sum, Rogers has failed to show that no rational trier of fact could have found him guilty based on the evidence presented at trial.

## III

Accordingly, we **AFFIRM** the judgment of the district court.

**CLAY, Circuit Judge, concurring in part and dissenting in part.** The majority correctly affirms the district court's denial of Defendants' motions to suppress evidence obtained from a search of a Chevrolet Equinox the night of their arrest and Defendant Charles Rogers' challenge to the sufficiency of the evidence supporting his convictions. Defendant Shawn Ford's claim that the search warrant for the upstairs unit in his home was based on stale information was also properly denied. I write separately to disagree with the majority's conclusion that Ford's grandmother, who told police that she did not reside in his downstairs apartment, had apparent authority to authorize its search.

## BACKGROUND

Police executed a search warrant at Ford's home on April 19, 2018. The warrant authorized the search of the "upstairs" unit of a "two-story, two-family residential dwelling . . . ." (Search Warrant, R. 36-2, Page ID #298.)

When the police arrived at the home, they were met by a man named Broderick Steward who claimed that he and his wife owned the entire building. Before officers received any consent to search the downstairs apartment, however, they learned from county records that a man named Michael Reeder was the owner of the house. When the police arrived, the downstairs apartment was locked. Steward explained to officers that his mother-in-law, Marcella Berry, had been staying in the downstairs apartment, but that she was currently staying at another home to watch her grandchildren due to his wife's sister's incarceration. When asked by an officer about who lived in the household, Steward listed a number of individuals, but did not mention Berry, stating "that's it." (Bauhof Body Camera Recording, R. 143, Ex. D1, 05:44–05:52.) Steward further explained that he was using Berry's absence as an opportunity to remodel and that the downstairs apartment was kept locked.

Detective Lisette Gonzalez, the primary investigator of the robberies, informed Steward that police had a search warrant for the upstairs unit. She further explained that police could obtain a search warrant for the downstairs unit. Steward interjected and explained that he could call his wife to have the downstairs unit unlocked and answered affirmatively when Detective Gonzalez asked him if he would consent to a search of the downstairs apartment. While Detective Gonzalez was on the phone with Steward's wife, Steward offered that he could call his mother-in-law for the keys to the downstairs unit so that police would not have to break down the door. When Detective Gonzalez asked Steward who lived downstairs, he answered that Ford normally stayed downstairs and the apartment had been empty since Ford had been incarcerated. Steward explained again that, while his mother-in-law had stayed in the downstairs apartment previously, she was currently elsewhere, taking care of her grandchildren.

A short time later, Detective Gonzalez prepared a consent to search form for the downstairs unit for Steward to sign. After reviewing the form, Steward explained that he did not think it was appropriate for him to sign it, and that they should wait for his mother-in-law. In light of the consent issues with Steward, Detective Gonzalez began the process of obtaining a search warrant for the downstairs unit by calling a prosecutor.

Before that process was completed, Ford's grandmother, Marcella Berry, arrived at the house. When Detective Gonzalez asked Berry whether she lived "here," Berry responded, "Yea and no." (Gonzalez Body Camera Recording, R. 143, Ex. E., 18:10–18:20.) After Detective Gonzalez repeated the question, Berry repeated her answer, explaining that she had not been living at the apartment for six months. Detective Gonzalez said that there could be issues with Berry signing the consent form because she had not lived at the apartment for six months. Detective Gonzalez then asked if Berry had property in the downstairs unit, and Berry answered that she had

plants and property there, that she "comes here every now and again" and that she had just changed the locks. (*Id.* at 19:33–19:44.) Berry then confirmed that she did not own the house, but suggested she was in the process of purchasing it.[1]

After this exchange, Detective Gonzalez determined that Berry had authority to consent to a search of the downstairs unit and prepared the consent to search form for Berry. As Detective Gonzalez was explaining the form to Berry, Gonzalez received a call from the prosecutor whose help she had requested in obtaining a second search warrant, but she told him that the warrant would not be necessary because "we have a family member that has property in the downstairs unit inside, and she has keys to the downstairs, so she's going to give us consent. So it doesn't look like I'll need the warrant." (*Id.* at 21:50–22:16.) Berry then led the police into the downstairs apartment. Once inside the apartment, Berry unlocked a couple of closets, which she said contained her property, including a firearm, but she was unable to identify Ford's room.

## DISCUSSION

It is well-established that "[a]n officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996). The question that Ford raises on appeal is whether his grandmother, Marcella Berry, had the proper authority to consent to the search of his downstairs apartment. "We review de novo the ultimate question whether this authority [to consent to a search] existed . . . ." *United States v. Sheckles*, --- F.3d ---, 2021 WL 1712267, at *12 (6th Cir. Apr. 30, 2021). The majority answers in

---

[1] Berry's intent to purchase the house cannot support a finding that she had the authority to consent to its search, as the government contends throughout its brief. A third party's authority to consent to a search of a defendant's property is based, in part, on the "right to permit the inspection in his own right . . . ." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). Someone, like Berry, who claims that she is in the process of purchasing a property does not have any right in the property, let alone the right to permit a search and may, in fact, never acquire such rights. Nor would it be fair to say that Ford "ha[s] assumed the risk that" someone who may or may not in the future own the property "might permit the common area to be searched." *Id.*

the affirmative, erroneously concluding that Berry had apparent authority to consent to the search, even though Berry did not live in the downstairs apartment with Ford, and the police knew that fact at the time of the search.

Two types of third parties may authorize the search of a defendant's home—those with actual authority and those with apparent authority. The majority did not answer the question of whether Berry had actual authority over the downstairs apartment because it concluded she had apparent authority. "[A] valid consent search requires either actual authority or apparent authority; it does not require both." *Id.* at *13. Berry had neither.

I.      **Actual Authority to Consent to Search**

The doctrine of actual authority was outlined in the Supreme Court's decision in *United States v. Matlock*, 415 U.S. 164 (1974). Even though the majority declines to address Berry's actual authority to consent to a search in light of its determination regarding apparent authority, the opinion relies on broad language from *Matlock* that a warrantless search is justified when "permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id.* at 171. But in *Matlock*, both the facts of the case—the question presented was whether the defendant's cohabitating romantic partner could consent to a search of their shared room—and the language of the decision itself make clear that co-occupancy is the critical factor in determining a third party's actual authority to consent to a search. The majority reaches the opposite result only by quoting portions of a footnote from the *Matlock* decision. The full quote is presented as follows, with the section omitted by the majority italicized: Common authority rests on "mutual use of the property by persons generally having joint access or control for most purposes, *so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and*

*that the others have* assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7 (emphasis added); Majority Op. at 15. As the portion of the footnote omitted by the majority makes clear, the Supreme Court did not contemplate in *Matlock* that non-co-inhabitants would have a relationship to a defendant's premises so as to be able authorize their search.

Subsequent decisions of the Supreme Court have confirmed the critical role of co-occupancy in the actual authority to consent inquiry. The Court's decision in *Fernandez v. California*, 571 U.S. 292 (2014), begins by citing *Matlock* for the proposition that "[o]ur cases firmly establish that police officers may search jointly occupied premises if one of the occupants consents." *Id.* at 294 (footnote omitted). In a footnote explaining its use of the term "occupant," the Supreme Court clarified, citing in particular the *Matlock* footnote discussed above, that "[w]e use the terms 'occupant,' 'resident,' and 'tenant' interchangeably to refer to persons having 'common authority' over premises within the meaning of *Matlock*." *Id.* at 294 n.1 (citing *Matlock*, 415 U.S. at 171 n.7); *see also Georgia v. Randolph*, 547 U.S. 103, 106 (2006) ("recogni[zing] a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant").

We have also recognized that authority to consent to a search is only possessed by co-occupants. For example, in *United States v. Johnson*, 656 F.3d 375 (6th Cir. 2011), we observed that one exception to the warrant requirement "is voluntary consent from an individual possessing authority." *Id.* at 377. We clarified "[t]hat person may be the one against whom evidence is sought, or it may be a co-occupant who shares common authority over the premises." *Id.*

Any argument that Berry had actual authority to consent to a search of the downstairs apartment would appear to be foreclosed by the Supreme Court's decision in *Illinois v. Rodriguez*,

497 U.S. 177 (1990), where the Court first endorsed the theory of apparent authority to consent to a search. The reason the issue of apparent authority was squarely before the Court, unlike in *Matlock*, 415 U.S. at 177 n.14, was because the third party who consented to the challenged search so "obviously" did not have actual authority. *Rodriguez*, 497 U.S. at 182. As with Berry, the record showed that the woman who had consented to the search in *Rodriguez* had moved out prior to the search. *Rodriguez*, 497 U.S. at 181. The fact she had left "behind some furniture and household effects," did not disturb this conclusion. *Id.* Nor did the fact that she had keys to the apartment. *Id.* Under *Rodriguez*, "it is clear" that Berry did not have actual authority to consent to the search of the downstairs unit. *Id.*

## II.      Apparent Authority to Consent to Search

If a third party lacks the actual authority to consent to a search, "a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not do so." *Id.* at 179.[2] Fundamentally, the majority misapprehends the nature of the apparent authority inquiry. It treats apparent authority as a diluted version of actual authority, when, in fact, its purpose is to allow law enforcement to reasonably rely on the information at hand, which may turn out to be false, in determining whether an individual can consent to a search. For example, in *Rodriguez*, the third party referred to the apartment that was searched as "'our' apartment," and it was "unclear whether she indicated that she currently lived at the apartment, or only that she used to live there." *Id.* Here, the record is clear that Berry told the police she had not lived in the downstairs unit for half a year.

---

[2] To the extent the majority suggests that information gathered by the police after they enter an apartment can "cure" a deficient apparent authority determination, that would appear to be foreclosed by *Rodriguez*'s focus on the officers' reasonable belief "at the time of entry." *See* Majority Op. at 17 n.2.

As the Supreme Court concluded in *Rodriguez*, "[t]he Constitution is no[t] . . . violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises . . . ." *Id.* at 186.[3] In this case, the police could not reasonably believe that Berry resided in the premises since she told them she had not been living there for six months.

Instead of relying on Berry's clear statement that she did not currently live in the downstairs apartment, the majority focuses on the prior ambiguous statements by Steward regarding Berry's relationship to the unit and Berry's own equivocal responses to Detective Gonzalez's inquiries as to whether she lived in the apartment. However, the majority does not explain why it would have been reasonable for police to believe that Berry lived in the downstairs unit based on that information in light of Berry's subsequent, repeated assertion that she had not lived in the downstairs unit for six months. Moreover, the police did not actually believe that Berry lived in the downstairs unit prior to initiating the search. After Berry confirmed to Detective Gonzalez that she had been living elsewhere for six months, Gonzalez explained that a consent search would be easier than a warrant, but: "Here's the problem. You just said you haven't lived here since last year in September. So, I mean, there might be an issue with you giving us consent." (Gonzalez Body Camera Recording, R. 143, Ex. E, 19:24–19:34.)

As we recognized in *United States v. Hudson*, 405 F.3d 425 (6th Cir. 2005), "[i]n crafting this rule of law [i.e., apparent authority], the Supreme Court lent critical weight to whether the

---

[3] The majority cites *Rodriguez*'s discussion of *Stoner v. California*, 376 U.S. 483 (1964), following the quoted passage as supporting the notion that a hotel clerk could have "had general access to or control" to authorize a search of a hotel room. *See Rodriguez*, 497 U.S. at 187–88. The majority then reasons "if a hotel clerk could conceivably have apparent authority over a hotel room in certain circumstances, then living at the residence cannot be a requirement." Majority Op. at 18. However, the majority's analysis is not supported by *Rodriguez*, which describes as "a preferable" reading of *Stoner* that police "could not reasonably have believed that [a hotel clerk] had general access to or control over" an occupied hotel room. *Rodriguez*, 497 U.S. at 188.

28

police could reasonably conclude that the party consenting to the search *lived* at the premises." *Id.* at 442.[4] Accordingly, as held by a prior published opinion of this Court, in determining whether a person has apparent authority to consent to a search, the question to be answered is whether the police could have reasonably believed that person resided at the premises. The majority disregards this precedent, purportedly on the basis of *United States v. Ayoub*, 498 F.3d 532 (6th Cir. 2007). *See Wright v. Spaulding*, 939 F.3d 695, 700 (6th Cir. 2019) (recognizing that the "holding of a published panel opinion binds all later panels unless overruled or abrogated en banc or by the Supreme Court"). But *Ayoub* is not at all applicable since we concluded there that the third party who had explicitly been granted custody of the premises by the owners and residents of the home "had actual authority to consent to the search, [so] it is not necessary to consider whether she had apparent authority." *Ayoub*, 498 F.3d at 541.

Even assuming the apparent authority inquiry was not controlled by *Hudson* nor focused on residency, reversal of the district court's denial of Ford's motion to suppress would still be required under the majority's own erroneous standard. According to the majority, "[i]f an officer reasonably believes that a third party had 'joint access or control for most purposes,' that consent is valid under apparent authority." Majority Op. at 16 (quoting *United States v. Penney*, 576 F.3d 297, 307 (6th Cir. 2009)). In this case, Berry told the police that she went to the unit "every now and again," that she had some property in the unit, including plants, and that she had recently changed the locks to protect her property. (Gonzalez Body Camera Recording, R. 143, Ex. E, 19:34–20:07.) Berry's characterization of the downstairs unit as a place where she stored some

---

[4] The district court recognized this precedent in its suppression order.

personal items and which she occasionally visited to water her plants could not reasonably be understood as "joint access or control for most purposes."[5]

Nor do any of the cases cited by the majority support a finding of apparent authority on these facts. For example, in *United States v. Penney*, we found that a romantic partner of the defendant had apparent authority to authorize a search because she told the police "that although the couple had broken up six months ago, they had now reconciled and that she had moved back in the day before." *Penney*, 576 F.3d at 307. *Penney* explained that "cohabitation need not be uninterrupted to support a reasonable belief in common authority," as the majority emphasizes, but that is very different than justifying a belief in common authority based on non-current cohabitation, as is the case here. *Id.* at 308. Similarly, in *United States v. Gillis*, 358 F.3d 386, 391 (6th Cir. 2004), we found that, given the circumstances, it was not unreasonable for police to rely on the consent of a third party whose name was on the lease and stated she still resided at the unit to be searched.

## CONCLUSION

The majority validates a search conducted pursuant to consent by an individual who did not live at the premises and whom the police knew was not a resident before they began their search. There is no justification for that conclusion in the Supreme Court's or our precedents. I respectfully dissent from that portion of the majority opinion.

---

[5] *Cf. United States v. Hall*, 979 F.2d 77, 79–80 (6th Cir. 1992) (per curiam) (finding that storage of personal items supported holding of common authority in combination with other factors not present in this case, including ownership of the entire house and all the furniture in the defendant's room; the fact that the defendant's room was never locked; and testimony that there was no agreement that the third-party consenter would not go into the defendant's room).